**Elouise JONES et al.**

**v.**

**The UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (HUD) et al.**

**Civ. A. No. 74–2628.**

United States District Court, E. D. Louisiana.

Dec. 12, 1974.

Joseph W. Thomas, Anthony W. Skidmore, John M. Blanchard, Okla Jones, II, New Orleans, La., for plaintiffs.

Michaelle F. Pitard, New Orleans, La., for United States and HUD.

Henry Kinney, New Orleans, La., for City of New Orleans and Moon Landrieu.

Robert Chatelain, New Orleans, La., for the Koffmans and Parkchester Realty Corporation.

Harry P. Gamble, III, Russ M. Herman, New Orleans, La., for Centurion of La.

## OPINION ON MOTION FOR A PRELIMINARY INJUNCTION

ALVIN B. RUBIN, District Judge:

The named plaintiffs in this class action represent everyone living in the Parkchester Apartments on September 26, 1974, the date this suit was filed. They have twice before asked the court to enter temporary relief, and now they seek a preliminary injunction to stop the proposed demolition ·and sale of the Parkchester property. Hearings were held on November 27 and December 2, 1974.

In their complaint, the plaintiffs claim that the Koffmans, the partnership that owns the Parkchester property; the Parkchester Realty Corporation, lessee and manager of the property; and the Department of Housing and Urban Development, which holds the mortgage on the Apartments, are engaged in a scheme to phase out the project and that this scheme is designed to discriminate against black persons. They also claim that the defendants have failed properly to maintain the buildings and grounds over the last few years because the once white project has become largely black. They joined as defendants Centurion of Louisiana, which holds an option to buy the property, and the City of New Orleans, but the plaintiffs have since voluntarily dismissed both these parties.

█ The plaintiffs also ask the court to enjoin any further action until HUD agrees to pay them the relocation assistance payments they claim are due them under the Uniform Relocation Assistance Act, 42 U.S.C. §§ 4601 et seq. On November 12, 1974, in an opinion on preliminary motions, the court granted HUD's motion to dismiss this claim because that statute does not require the payment of benefits to persons displaced by the sale of land to a private developer but only to persons who must be relocated because the construction of new federal projects requires existing structures to be removed. Therefore that claim is no longer before the court. The plaintiffs also ask for an injunction preventing further action until HUD files an environmental impact statement of the kind required by the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). They claim that HUD's action in approving the demolition of buildings and sale of the land amounts to major federal action, significantly affecting the human environment. This claim remains before the court.

Shortly after the plaintiffs filed their complaint, the court granted a limited temporary restraining order preventing the demolition of any buildings other than the eleven then vacant and scheduled for demolition. This order could be effective for only ten days under the Federal Rules of Civil Procedure; it lapsed two months ago. On October 23, 1974, the plaintiffs asked the court to enjoin several state eviction proceedings based on allegations of non-payment of rent. The court denied their motion for reasons fully given at the hearing. In brief, however, this was because there had been no racial discrimination shown in the evictions; each eviction has been the result of a court action, and in each case has been preceeded by a notice to pay, notice of the eviction proceeding, and a chance to appear in court to assert any defenses to the eviction effort.

Although their complaint also asks for damages, the plaintiffs' motion for a preliminary injunction seeks only to prevent any further demolition, the eviction of any tenants (including those who have not paid their rent for several months, in protest against the conditions at Parkchester), and the sale of the Parkchester property to Centurion of Louisiana. The motion also asks the court to direct HUD to enforce and Parkchester Realty to comply with the

maintenance provisions of the regulatory agreement between them.

At the hearing on their motion, the plaintiffs proved that conditions in the Parkchester Apartments have changed drastically in the last few years. The evidence demonstrates that these once liveable buildings have become virtually uninhabitable. The Parkchester Apartments show the classic signs of urban decay in its most acute form: leaky ceilings, broken windows, locks that no longer work, cracked and ripped out walls, broken, leaking plumbing. Many of the buildings are now abandoned, and the interiors of the apartments in them have been ripped apart. Rubbish has accumulated throughout the project, and rat infestation is a serious problem. Conditions are, in short, deplorable.

But the fact that these apartments are not suitable places for people to live does not mean that a federal court has authority to make them habitable or to order someone else to do so. Federal judges have no blanket authority to right all wrongs and remedy every injustice, however troubled by them they may be. The same Constitution that protects the rights of the people limits the jurisdiction and the authority of federal judges.

This is as it should be. For in a democratic society, the power to make laws belongs to the Congress, elected by the people. And the duty to execute the laws rests on the President, who is also elected. In part, the limitations placed on the federal courts come from the people's unwillingness to place too much power in the hands of men appointed for life, and every judge who takes an oath to uphold and defend the Constitution must scrupulously respect those limitations. In part, these restrictions come from the nature of the judicial process itself. "Justices of the Court are not architects of policy. They can nullify the policy of others; they are incapable of fashioning their own solutions to social problems." Frankfurter, Mr. Justice Holmes and the Supreme Court 25 (1938).

The federal courts can act only when the Constitution, a statute or a rule of common law authorizes them to act. To succeed, the plaintiffs must prove that the defendants have in some fashion violated federal law and that, under the tests the law directs the court to apply, they are entitled to a preliminary injunction. The plaintiffs claim that the governmental and private defendants have violated the laws in several respects. These claims, and the evidence on which they must be decided, are complex and must be dealt with separately.

*Racial Discrimination in Maintenance*

In Counts I and II of their complaint, the plaintiffs allege that HUD and the Koffmans have failed for racially discriminatory reasons to maintain the apartments and property. Their basic argument is that the property deteriorated at the same time that the racial composition of the apartments changed; they urge the court to infer that the Koffmans, with HUD's knowledge and help, deliberately permitted the property to deteriorate because black tenants had replaced white ones. They charge that HUD violated Executive Order No. 11063, Nov. 20, 1962, 27 F.R. 11527, which obliges HUD to prevent racial discrimination in certain federally assisted housing; and that it administered a federal program in a racially discriminatory way, violating the Fifth Amendment. The plaintiffs also charge that the Koffmans have violated 42 U.S.C. § 1982, which guarantees all citizens the same property rights that white citizens enjoy, and 42 U.S.C. § 2000d, which prohibits persons receiving federal financial assistance from engaging in race discrimination.

There is no need to confront the legal issues these charges raise. The plaintiffs have failed to prove an initial and essential element of their case. The evidence does not demonstrate that there is any significant difference in the amount of maintenance work being done on the

Parkchester complex now as compared with the most recent years in which the majority of the residents of the Apartments were white, considering completely objective economic data.

During the years 1967 through 1974, the racial composition of the project changed completely. Defendant Koffmans' Exhibit 7 demonstrates the change:

Occupancy

| Year | White | Black | Spanish American | Oriental | Total |
|------|-------|-------|------------------|----------|-------|
| 1968 | 1147 | 5 | (In these years the government report forms showed | | 1152 |
| 1969 | 908 | 261 | no columns for these ethnic groups. Presumably they | | 1169 |
| 1970 | 640 | 544 | were encompassed in the "white" data) | | 1188 |
| 1971 | 110 | 798 | 204 | 4 | 1116 |
| 1972 | 44 | 961 | 65 | 2 | 1072 |
| 1973 | 27 | 965 | 20 | 2 | 1014 |
| 1974 | 7 | 650 | 4 | 2 | 663 |

The plaintiffs and others testified that during this period the condition of the apartments greatly deteriorated. But the evidence does not demonstrate that this deterioration was due to any difference in the maintenance policies of the defendants, or that it was caused by the ethnic change in the tenancy.

Plaintiffs' Exhibit 2 sets out the amount of money spent on maintenance and repairs during each year from 1967 through 1973 and shows the amount as a percentage of the 1967 expenditure. When set next to the Department of Labor's cost of living index for these years, again using 1967 as a base, the plaintiffs' own figures tell a revealing story:

| Year | Cost of Living (1967 = 100) | Cost of Maintenance and Repairs (1967 = 100) |
|------|------------------------------|----------------------------------------------|
| 1967 | 100 | 100 |
| 1968 | 104.3 | 107.3 |
| 1969 | 109.1 | 116.3 |
| 1970 | 116.3 | 124.0 |
| 1971 | 121.3 | 133.7 |
| 1972 | 125.3 | 140.7 |
| 1973 | 133.1 | 151.0 |

As Parkchester changed from a project occupied almost exclusively by whites to one tenanted largely by blacks, the amount spent by its owners on maintenance and repairs increased, and increased at a rate faster than the increase in the cost of living.

Moreover, both the percentage of rental income spent on operating expenses and the amount of money paid to the project staff increased during this period, as Defendants' Exhibits 1 and 4 show:

| Year | Payroll | % Rental Income Spent on Operating Expenses |
|------|---------|----------------------------------------------|
| 1967 | $231,693 | 49.7 |
| 1968 | 201,962 | 50.3 |
| 1969 | 225,490 | 51.8 |
| 1970 | 218,185 | 51.7 |
| 1971 | 266,091 | 54.2 |
| 1972 | 273,038 | 66.7 |
| 1973 | 250,311 | 71.9 |

During this period the number of employees of the Parkchester Realty Corporation has remained relatively stable, ranging from a low of 46 employees in 1973 to a high of 59 in both 1967 and 1972.

The court need not pass upon the plaintiffs' claim that the private defendants administered the Parkchester Apartments in a racially discriminatory manner and that HUD assisted them, although it should be noted that the plaintiffs introduced no evidence whatsoever of racial animus or motivation. The evidence fails to demonstrate that the change in conditions at Parkchester resulted from the defendants' actions; the evidence fails to prove that Parkchester maintenance practices have changed at all. If the evidence shows anything, it shows that the Koffmans spent more money and used a larger percentage of the rental income from the project for maintenance when the project became black than they had when it was white.

If the court's conclusions on this issue leave the changed conditions at Parkchester unexplained, the defendants' evidence, and even some of the plaintiffs', suggests an explanation. The defendants called Francis Robbin, the Administrator and Chief Building Inspector of the City's Safety and Permits Department. He testified that his agency's inspection of the project demonstrated that the damage to the buildings was done by people and did not result from deterioration over time, that is, from what is known as normal wear and tear. The structures, he said, are still basically sound, although they are beyond economic repair. It would cost more to restore the apartments to good condition than could be repaid out of their rental. On cross-examination, he explained his conclusions by noting that the difference between disintegrating sheetrock and sheetrock ripped from the walls, or between broken plumbing and plumbing that has been torn out, is apparent to the naked eye. One of the plaintiffs' principal witnesses echoed his conclusions when she testified that during the period we are discussing "malicious" activities and vandalism increased. Responding to this, the plaintiffs intimated that the owners should have employed more guards, and been more militant in defending the property. They do not explain where the funds for this would have been obtained, or what the response of the black tenants would have been to a more vigilant guard policy adopted as tenants became predominantly black.

### Violations of the Regulatory Agreement

■ In 1966, the Department of Housing and Urban Development, the Koffmans, and the Parkchester Realty Corporation entered into a "Regulatory Agreement for Multi-Family Housing Projects Except Non-Profit and Section 213." In the agreement, the private parties agreed to "maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition." The plaintiffs claim that the Koffmans have failed to live up to this agreement and HUD has failed to enforce it.

But the agreement must be read as a whole, and it also includes a stipulation that the owners (the Koffmans) and the lessee (Parkchester Realty)

"do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners and Lessee shall remain liable under this Agreement only with respect to the matters hereinafter stated, namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof."

Under this contract the Koffmans are not required to put up any money of their own to maintain the apartments; they are required only to use the rentals for that purpose. Uncontroverted evidence demonstrates that the Parkchester project has been operated at a deficit during the entire period at issue. The Koffmans have been unable to make any

payments on the principal of their note since 1970. The evidence shows that they have used all of the rentals and, in addition, some of their own funds to maintain the property. Because the agreement requires the Koffmans to maintain and repair the property only to the extent that the project's income permits, they have not breached the agreement and HUD has not failed to enforce it.

*Racial Discrimination in Closing Parkchester*

■ In Count V, the plaintiffs charge in part that HUD has engaged with the private defendants in a plan to close down Parkchester. The evidence demonstrates that this part of their claim is true. Under the regulatory agreement, HUD must approve the demolition of any project buildings. HUD has done so, and it has indicated an intent to authorize more demolition if the plaintiffs do not prevail in this lawsuit. HUD also must ultimately approve the conveyance of the mortgaged property to Centurion, and it did nothing to discourage the negotiations for an option between the Koffmans and Centurion of Louisiana. The Koffmans have at least consulted HUD in formulating their plans to demolish the project and sell the land. HUD has not attempted to block their plans.

But the plaintiffs must show more to prove their case for relief on this issue. They must show that the defendants plan to close down the project for racially discriminatory reasons. At the hearing they introduced no direct evidence from which the court could conclude that the defendants have been motivated by race. Instead, they ask the court to infer from the mere fact that the project *is* occupied almost entirely by black tenants the conclusion that the project is being phased out *because* it is all black. But it is not logical to infer that just because one event happens after another it happens because the other occurred. The evidence shows an alternative explanation for the defendants' plan to close

down the Parkchester Apartments. The testimony and the other evidence adduced at the hearing lead to the conclusion that the Parkchester Apartments are simply no longer economically viable. Rehabilitation would cost too much, for the apartments could not generate enough income to amortize the cost of the necessary repairs. There is no reason to look for hidden reasons and racial motivation behind the defendants' desire to close down Parkchester; simple economics explain it. In addition, the history of the project shows that in operating the project the owners have not discriminated against black tenants; they have welcomed all tenants regardless of race. Indeed, the plaintiffs offered evidence that the owners had not sought to screen out any black tenants prior to renting to them and suggested that this should have been done to exclude the less desirable tenants. Surely had the owners done this, a charge of discrimination in renting would have followed.

*Due Process in Closing Parkchester*

■ The plaintiffs also claim in Count V that they are entitled to a hearing before the Parkchester Apartments are closed and demolished, at which an impartial official may hear evidence and determine the rights of the tenants. This broad claim seems to embody several, separable claims that must be dealt with in detail. But the claim also presents a threshold issue: is the federal involvement in Parkchester sufficient to conclude that the Koffmans and Parkchester Realty, as well as HUD, are bound by the Fifth Amendment's command that no person shall be deprived of his property except by due process of law?

HUD does participate in the project as mortgagee, and it has waived payments on the mortgage principal for several years. There is also evidence that HUD has approved several necessary steps in the plan to close Parkchester. Whether this evidence is enough to make the Koffmans' action "federal" action for some, if not for all, purposes is a

difficult question. See Note, Procedural Due Process in Government Subsidized Housing, 86 Harv.L.Rev. 880, 903–04 (1973). The court need not deal squarely with it, however, because the disposition of this motion as to the private defendants does not require it. For the purposes of this discussion I assume that the requirements of the Fifth Amendment apply to them.

Since Goldberg v. Kelly, 1970, 397 U. S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, and its progeny, it is clear that the termination of any governmental benefit brings the due process clause into play. It is no longer enough for the governmental agency, or—as in this case—the landlord, to say that continued enjoyment of the benefit is a matter of privilege and not of right. It is clear, too, that the protections of the Fifth Amendment apply to an individual's occupancy of government-subsidized housing. See Caulder v. Durham Housing Authority, 4 Cir. 1970, 433 F.2d 998, and Escalera v. New York Housing Authority, 2 Cir. 1970, 425 F.2d 853, involving eviction proceedings; McKinney v. Washington, 1970, 143 U.S.App.D.C. 4, 442 F.2d 726, and Burr v. New Rochelle Municipal Housing Authority, 2 Cir. 1973, 479 F.2d 1165, involving proposed rent increases; South East Chicago Commission v. Department of Housing and Urban Development, 7 Cir. 1973, 488 F.2d 1119, where the court refused to require a hearing before the federal government made mortgage and rent subsidy commitments to a developer.

But "due process" is not a simple list of requirements to be imposed automatically whenever the Fifth Amendment is found to apply. Rather, "considerations of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union, etc. v. McElroy, 1961, 367 U.S. 886, 81 S.Ct. 1743, 1748–1749.

The plaintiffs' claim, though made in one sweeping phrase, is really a claim that several distinct private interests should be protected. In analyzing each of them, it is important to remember that, in the Supreme Court's phrase, the "nature of the governmental function" here is such that the federal government acts only indirectly on the individuals whose rights are at issue. In a similar vein, if the Koffmans and Parkchester Realty are considered to act in some ways as federal agencies, they must heed the Constitution; but they remain to some extent simply private property owners.

Plaintiffs seek first to protect with due process mechanisms their interest in continuing to live in their present apartments. For those tenants who have ceased to pay their rent, and face state eviction proceedings on these grounds, the protections afforded by the state courts are adequate. Certainly they afford due process of law, Lindsey v. Normet, 1972, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36, and any federally-mandated hearing would afford no further protection. Occupants cannot be evicted without notice and a chance to be heard in state court. There is no evidence nor even any claim that the state court will not give them a full and fair hearing.

The tenants who have paid their rent may have a different interest to assert. They could be evicted only for lapse of time, on the grounds that their leases have expired, or for some violation of their leases. It is possible that tenants who live in a federally owned project or a federally subsidized project for a period of time, pay their rent, and comply with the other requirements that the law makes of tenants, develop a reasonable expectation of continued occupancy that should be protected. See, e. g., Perry v. Sindermann, 1972, 408 U.S. 593, 601–602, 92 S.Ct. 2694, 33 L.Ed.2d 570. Were the court faced with evictions from a subsidized housing project brought so that the owners might move in other tenants instead of the plaintiffs, the plaintiffs' reasonable expecta-

tions of continued occupancy might well be entitled to due process protections.

But the situation at Parkchester is unique. For some time, because of the rapid and obvious deterioration of the project, the number of vacancies, the impossibility of maintaining the project with the income that is coming in, and because the defendants' plans for the property are public knowledge, it must have been apparent to all tenants that there was no reasonable expectation that Parkchester would continue to exist. Even in this lawsuit the plaintiffs do not ask the court to enjoin the demolition of Parkchester forever; they ask only that it be halted for a time. On the peculiar facts of this case, due process does not require that this interest in continued tenancy for a foreseeably brief period be safeguarded by requiring notice and a hearing with regard to any plans for the property.

The plaintiffs next assert an interest in continuing to occupy government subsidized housing, whether it is in the Parkchester Apartments or in some other project. Courts cannot create housing, nor do they have funds to rebuild deteriorated projects. The availability of housing and of federal funds depends on congressional action. Therefore, there is some doubt that this sort of interest can be vindicated either in a suit of this kind or in some sort of administrative hearing. However, in this case the court need not reach that issue, because the plaintiffs have failed to demonstrate that the phasing-out and closing of Parkchester will seriously jeopardize their ability to find government subsidized accommodations.

Plaintiffs' expert, Dr. Thayer, testified that the displacement of 400 families (approximately the number remaining in Parkchester) would have "devastating" effects on the New Orleans housing market. His testimony, however, was given in largely conclusionary terms; his answers on cross-examination demonstrated that he was not fully familiar with specific, local housing conditions.

More useful on this issue was the testimony of Mr. Thomas Armstrong, HUD's area director. He testified that, as of November 4, 475 low income housing units were available in the New Orleans area, and he listed the location of each one. Rent payments for them would be about the same as present rents at Parkchester. Although the plaintiffs might have attempted to demonstrate either that there are not in fact the number of units available that Mr. Armstrong said, or that these projects are less desirable than Parkchester, they did not do so. On the basis of the evidence adduced at the hearing, I can find only that the plan to close Parkchester does not endanger these plaintiffs' interest in continuing to live in some government-subsidized housing.

Finally, the plaintiffs assert a right to an adequate supply of low-income housing in the New Orleans area, both now and in the future. They argue that they are entitled to a hearing, or at least to a determination, that conversion of Parkchester from a low-income project to what is outlined as a shopping and upper-income residential complex is faithful to HUD's duties under the Housing Act of 1949, 42 U.S.C. § 1441 et seq. There is some evidence that the project plans may include some low income housing and some housing for low income elderly persons, but the number of low income units would in any event be less than the number of units at Parkchester, and there is no firm assurance what kind of project will eventually be developed. Indeed, because of economic conditions, and because Centurion has only an option, the entire redevelopment may not materialize.

Congress has indicated an intention to afford an adequate supply of low income housing in urban areas. But the mere fact that this policy has been adopted does not mean that an individual has a right to sue HUD or the Koffmans to compel them to provide that particular person with a living facility. The plaintiffs have directed the court's

attention to no case, and the court has been unable to find any, holding that the Act's admittedly ambitious statement of policy creates either an individual cause of action or a private interest that should be afforded the procedural protections of due process. The policy statement can be implemented only by an appropriation of money. There has been no showing that Congress has made funds available for the purpose, or that HUD has funds available that might be so used.

 There is some authority for a proposition similar to the one the plaintiffs advance, though the right and the relief available are both narrower in scope. In Shannon v. United States Department of Housing and Urban Development, 3 Cir. 1970, 436 F.2d 809, the court reviewed the Department's approval of a change in an urban renewal plan from one contemplating a substantial number of owner-occupied dwellings to one contemplating mostly low-income rental dwellings. The court looked first to the Civil Rights Act of 1964, 42 U.S. C. § 2000d, which forbids discrimination in the administration of federally-assisted programs, and then to the Civil Rights Act of 1968, which provides:

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. 42 U.S.C. § 3601.

The Act also imposes upon the Secretary of HUD a duty to "[a]dminister the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(d). This, it will be noted, goes beyond a policy statement and imposes a specific duty on a government official.

The court therefore held that HUD's discretion under the National Housing Act "must be exercised within the framework of the national policy against discrimination in federally assisted housing, . . . *and in favor of fair housing*. . . ." (Emphasis supplied) 436 F.2d at 819. The court concluded "that the Agency must utilize some institutionalized method whereby, in considering site selection or type selection, it has before it the relevant racial and socio-economic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts." 436 F.2d at 821. The court then outlined the questions this fact-finding process should answer, and suggested that a public hearing of some kind might be appropriate, although it declined to order such a hearing. 436 F.2d at 821–822.

HUD has, both formally under the regulatory agreement and informally in its dealings with the Koffmans, a substantial voice in the future of Parkchester. It has of course an equally substantial amount of discretion about what it will require in return for its approval. Its discretion must be exercised on the basis of adequate information, and in a way that comports with the requirements of the 1964 and 1968 Civil Rights Acts. On the record now before the court, it is not clear that HUD has given consideration to these factors or accumulated in a systematic fashion the information necessary to do so. No less here than in *Shannon*, it must.

*The National Environmental Policy Act*

 The National Environmental Policy Act[1] directs all federal agencies

---

1. The statute reads:
[A]ll agencies of the Federal Government shall— . . .
include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be in-

to include an environmental impact statement in every "recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The plaintiffs claim that HUD's approval of the closing, demolition and sale of the Parkchester Apartments amounts to major federal action significantly affecting the quality of the environment, and that HUD must prepare and make available a NEPA impact statement before it may give its approval. HUD responds that no impact statement is required because no "major federal action" is proposed.

After some initial uncertainty over its scope, NEPA's requirements have been broadly interpreted and strictly imposed by the courts. See, e.g., Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 1971, 146 U.S. App.D.C. 33, 449 F.2d 1109; Anderson, NEPA in the Courts, 49–55 (1973). There is authority for the proposition that NEPA applies to housing construction and changes in the use of land devoted to housing. "Environment" means something more than rocks, trees, and streams, or the amount of air pollution. It encompasses all the factors that affect the quality of life: crowding, squalor, and crime are obviously adverse environmental factors. See, e.g. Silva v. Romney, 1 Cir. 1973, 473 F.2d 287; McLean Gardens Residents Ass'n v. National Capital Planning Comm'n, D.D.C. 1972, 2 ELR 20662; see also Anderson, NEPA in the Courts, 66–141 (1973).

In Save Our Ten Acres (SOTA) v. Kreger, 5 Cir. 1973, 472 F.2d 463, the Fifth Circuit announced the standards for reviewing an agency's determination not to file an environmental impact statement. The district court is first to

review the plaintiff's complaint on its face; if the plaintiff alleges that the proposed action "would materially degrade any aspect of environmental quality," 472 F.2d at 466, the court must hold a hearing. Under the liberal standards of notice pleading, the plaintiffs in this case have made the necessary allegations. Aside from the effects of the change in the land use proposed for the Parkchester property on housing conditions within the city, the new development contemplated will change the income characteristics of the area's residents and may increase traffic congestion.

The court is then, under SOTA's procedure, to hear the evidence, which may include the administrative record, "supplemental affidavits, depositions and other proof concerning the environmental impact of the project . . .." 472 F.2d at 467. Then, "if the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement or grant . . . such other equitable relief as it deems appropriate." 472 F.2d at 467.

The evidence adduced on both sides of this issue is slender at best. Cf. Hiram Clarke Civic Club, Inc. v. Lynn, 5 Cir. 1973, 476 F.2d 421. Nonetheless there is enough evidence to conclude that HUD has not made the kind of determination that, under SOTA, it must make. HUD's approval of the actions the Koffmans must take in order to clear the Parkchester property and convey it to Centurion of Louisiana is federal action. Because the change in land use will affect a sizeable area of the city and a

volved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . . ..

number of people, and because HUD has an effective veto power over it, HUD's action in approving the transfer and the steps preliminary to it are "major" federal action. The change in land use proposed—from a low-income project to a mixed shopping and upper income residential development—will have significant effects on the human environment. The change may well be, on balance, for the better. But NEPA leaves that issue in the first instance to the environmental impact study, not the federal courts. Nor does it matter that HUD approves only a sale to a private party, as long as it knows the purpose of the sale. See National Forest Preservation Group v. Butz, 9 Cir. 1973, 485 F.2d 408. For these reasons, it seems clear to me that HUD must, before giving its approval to these actions under the regulatory agreement, consider the environmental impact of its action. It should at least determine, in the manner used in *Hiram Clarke*, whether an impact statement should be filed.

### The Appropriate Relief

▮▮▮▮ Merely because HUD has not fulfilled its responsibilities under the 1964 and 1968 Civil Rights Acts and NEPA, it does not automatically follow that all further action to accomplish the closing of Parkchester ought to be enjoined until HUD does so. Greene County Planning Board v. Federal Power Comm'n, 2 Cir. 1972, 455 F.2d 412, cert. den. 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; Environmental Defense Fund v. Froehlke, W.D.Mo.1972, 348 F. Supp. 338. See also Anderson, NEPA in the Courts, 239–45 (1973). The court has authority to enjoin HUD from approving further demolition of buildings and the sale of the property, although it has no authority to enjoin further evictions for non-payment of rent. The wisdom of such an injunction is, of course, another matter. See Silva v. Romney, supra.

Injunctive relief is equitable relief, and before a court issues an injunction it must balance the benefits and harms to the various interests involved. The court has not investigated the full scope of the legal proprieties of various actions that might be taken, and the parties have not done so either. Therefore the statements here are merely illustrations, not indications of possible courses of action. The parties might want to consider the possibility of an injunction against HUD to prevent it from approving the sale of the property while permitting the demolition of vacant buildings. See Lathan v. Volpe, 9 Cir. 1971, 455 F.2d 1111, 1116–1117, modified on reh'g, 455 F.2d 1122. It may be that a decree could properly require HUD to take steps to alleviate any untoward effects on the human environment the closing of Parkchester may have—by giving present tenants preference in subsidized housing, by offering moving aid, and perhaps by assisting them in obtaining financial assistance. An appropriate decree, based solely on the violations of NEPA and the Civil Rights Act found here, might order HUD to take all or some combination of these steps or other action not intimated here.

The parties have not focused their attention on these issues. Except for extracting a few conclusionary statements from Mr. Armstrong, the parties to the case have not addressed themselves to the NEPA issue since the first hearing on temporary relief, although it was on the basis of a probable NEPA violation that I entered a limited restraining order. In order to give them a chance to respond to the concerns expressed in the last section of this opinion, I order that the plaintiffs file within 10 days a proposed decree, accompanied by a brief statement of authorities if they rely upon any other than those cited in this opinion. The defendants will respond within 10 days thereafter, with proposed modifications and a similar statement of authorities. In the meanwhile, no injunction will issue because HUD has assured the court it would take no further steps until this case is decided. Since the court has de-

cided that the eviction of tenants for nonpayment of rent will not be enjoined if accomplished in accordance with legal requirements, the HUD assurance does not encompass action of this kind.