The **UNITED STATES of America,**
**Plaintiff,**

v.

**Garney WHITE and Margie White, Defendants.**

**No. WC 74–87–K.**

United States District Court,
N. D. Mississippi,
Delta Division.

March 11, 1977.

Falton O. Mason, Jr., Asst. U. S. Atty., Oxford, Miss., for plaintiff.

Alvin O. Chambliss, Jr., Oxford, Miss., David M. Madway, Berkeley, Cal., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this case, the United States, which was the highest bidder at a nonjudicial foreclosure sale, brought eviction proceedings against defendants, Garney White and Margie J. White, husband and wife, as house purchasers who had defaulted on a Farmers Home Administration (FmHA) loan made under the Farm Housing Act of 1949. After foreclosure was effected in accordance with a power of sale contained in the deed of trust, this court entered summary judgment for the government. The Court of Appeals at first affirmed by means of Local Rule 21, 5 Cir., 536 F.2d 386. On petition for rehearing, the Fifth Circuit concluded that the basis of this court's summary judgment for the government was in doubt and remanded the case for determination of two issues: (1) Whether the defendant borrowers had waived any constitutional or statutory rights they may have had, and (2) if they had not, whether the procedure utilized by FmHA passed constitutional muster and met federal statutory requirements. 543 F.2d 1139 (5 Cir., 1976).

Following remand, the court conducted an evidentiary hearing at which the following relevant facts were revealed. In March 1971 the defendants applied for a rural housing loan to the FmHA at its Pontotoc County, Mississippi, office for the purpose of purchasing a dwelling house which was then in process of being completed by an independent builder, Jackson Lumber Company. The house was inspected by FmHA officials who determined that it had a value of $14,600, and the application of the Whites for a loan in that amount was approved in due course.

Garney White, then 46 years of age, was a person of limited education, and although he had received a fifth grade education he was unable to read or write other than to sign his name. After serving in the Army, he received a medical discharge for back and other injuries, making him 100% disabled. He continued under the care of Veterans Administration doctors and his income consisted principally of a veteran's pension of $82 per month. Margie J. White was better educated than her husband and worked as a clerk in a variety store. She had prior experience in reading and signing deeds of trust on loans made with private individuals and she, like Garney White, realized that the effect of such an instrument was to create a lien against the real estate, and that if payments were not made when due, the property was subject to foreclosure by the owner of the indebtedness.

After receiving notice that their loan had been approved, the defendants employed W. A. Grist, Pontotoc attorney, to check the title to the real property, represent their interests in the loan closing and fulfill other duties on their behalf incident to the transaction. Grist, who was on the approved list of FmHA attorneys for Pontotoc County, had prior experience in closing FmHA loans and his fee for the services rendered on this occasion was paid by the borrowers. The $14,600 loan was closed on March 30, 1971, when the borrowers appeared at the local FmHA office. Although both of the Whites testified that attorney Grist did not accompany them on this occasion, this is disputed by the testimony of Grist as well as the FmHA officials who affirmed that Grist was indeed present when the loan was closed. The court finds as a fact that Grist was then present as attorney for the borrowers and that Mrs. Dillard, one of the FmHA office employees prepared the promissory note and deed of trust, in accordance with custom, and indicated to the borrowers where they should sign. Grist had other papers, affidavits and the like, which he then presented to the Whites for execution to complete the loan.

**1248**

Grist conceded that he did not read the loan documents to the Whites, testifying that he reviewed with them only the "highlights" of the loan, such as its amount, the rate of interest, the amount of monthly payments, the interest credit,[1] for which the Whites qualified, and certain other features of the loan agreement. More particularly, the attorney did not read or make any detailed explanation to the borrowers of ¶ 18 in the deed of trust, providing in relevant part: "Upon default aforesaid, at the request of the Government, Trustee may foreclose this instrument by advertisement and sale of the property as provided by law, for cash or secured credit at the option of the Government, personal notice of which sale need not be served on borrower, . . . ." In preceding ¶ 17, the deed of trust recites: "Should default occur in the performance or discharge of any obligations secured by this instrument, . . . the Government, at its option, with or without notice, may: (a) declare the entire amount unpaid under the note and any indebtedness to the Government hereby secured immediately due and payable, . . . ." Neither Grist nor FmHA officials explained to the borrowers that the loan documents gave the government the right to exercise power of sale in accordance with Mississippi law upon default in the payment of the indebtedness without first extending to the borrowers notice of the asserted grounds for default and an opportunity for the borrowers, in case of disputed matters, to be heard, prior to the acceleration of the indebtedness and commencement of foreclosure proceedings by FmHA.

At the time of the loan, the borrowers qualified for an interest credit, or subsidy, which would reduce their loan payments to $54 monthly. This credit was a subsidy for which the borrowers had to apply at the end of each two-year period. Without the original interest credit, FmHA officials calculated that the monthly payments would rise to $98. Not long after the Whites moved into the residence, they complained to FmHA of needed repairs to the house, and FmHA officials who inspected the premises agreed with some of the complaints. Efforts were made by FmHA to have Jackson Lumber Company, the builder, take necessary corrective action. Garney White made regular payments for 18 months, but after repairs were not made to his satisfaction, he refused to make further payments. At this time his alleged arrearage was no more than $22.40. The Whites, however, continued to deny the existence of any arrearage. This dispute was not resolved, but came to a head when the borrowers became 4 months delinquent on monthly payments and the FmHA officials decided to eliminate any interest credit; this action, which practically doubled the monthly payments, was taken on the grounds that Margie J. White had become gainfully employed and that the Whites had failed to execute a new interest credit agreement.

Beginning in April 1973, FmHA's local officials unsuccessfully attempted to get the borrowers to bring the account current. Instead, the defendants, after Grist had declined to represent them, engaged Stanley Taylor, a legal services attorney, to aid them in their problems with FmHA. Taylor obtained an independent appraisal of the house to determine the nature and extent of the defects. According to this appraisal, the defects were substantial and far more serious than those which FmHA inspectors had noted. Taylor not only submitted this appraisal to FmHA but called upon FmHA

1. FmHA is authorized to make contributions during the existence of the loan under certain conditions set forth in § 503 of the Housing Act of 1949, 42 USC § 1473. The statute provides in relevant part:

The Secretary may agree with the borrower to make annual contributions during the said five-year period in the form of credits on the borrower's indebtedness in an amount not to exceed the annual installment of interest and 50 per centum of the principal payments accruing during any installment year up to and including the fifth installment year, subject to the conditions that the borrower's income is, in fact, insufficient to enable the borrower to make payments in accordance with the plan or schedule prescribed by the Secretary and the borrower pursues his plan of farm reorganization and improvements or enlargement with due diligence.

officials to consider the inability of the borrowers to make the account current due to circumstances beyond their control, particularly the physical disability and medical condition of Garney White, the total financial resources available to the borrowers, and whether they were unable to continue making payments without unduly impairing their standard of living. Taylor requested FmHA officials to investigate this aspect of the matter to determine what relief, if any, could be extended to them under § 505, Housing Act of 1949, 42 USC § 1475 (1970).[2] The record shows that no meaningful investigation was conducted by FmHA officials to determine the applicability of § 505 relief.

On November 12, 1973, R. M. McCord, FmHA's county supervisor, advised Garney White that upon failure to bring his account current by January 1, 1974, his case would be submitted to the County Committee and the District Supervisor as a preliminary step to foreclosure. Having then received no response, McCord, knowing the continued existence of the disputes with the Whites, informed them on December 4, that he, the County Committee and the District Supervisor had determined "that continued servicing of [the] loan will not accomplish the purpose for which the loan was made." Therefore, he advised defendants that they were required to take one of the following steps before December 31: (1) pay their

account current; (2) sell the property and pay in full; (3) refinance the loan through a private lender; (4) transfer the property to an eligible borrower; (5) convey the property to the government.[3] Attorney Taylor responded on December 18 and requested a hearing to consider whether the house met contract standards and the appropriateness of eliminating interest credit. On January 8, 1974, McCord and Taylor scheduled this hearing for the 29th of that month. However, on January 10, the Whites, then in default for much of 1973, received notice of acceleration and demand for payment from FmHA's state office, giving them until the 25th to pay in full the entire debt, plus interest, or suffer foreclosure of their property. The next day McCord wrote FmHA's state office requesting a delay in any action until the hearing was held on January 29. At this meeting, however, McCord advised Taylor that since the paperwork had already been forwarded to the state office, the County Committee was powerless to stop the foreclosure.

Pursuant to FmHA's direction, McCord, named as trustee in the deed of trust, instituted foreclosure proceedings. These proceedings, which commenced April 18, 1974, were conducted strictly in accordance with the terms of the deed of trust which conferred a power of sale upon the trustee, and were exercised in accordance with state law.[4] This resulted in the trustee's selling

**2.** § 505 provides as follows:

During any time that any such loan is outstanding, the Secretary [of Agriculture] is authorized under regulations to be prescribed by him to grant a moratorium upon the payment of interest and principal on such loan for so long a period as he deems necessary, upon a showing by the borrower that due to circumstances beyond his control, he is unable to continue making payments of such principal and interest when due without unduly impairing his standard of living. In cases of extreme hardship under the foregoing circumstances, the Secretary is further authorized to cancel interest due and payable on such loans during the moratorium.

**3.** It is unclear what is meant by the word "current" in No. 1. If FmHA included the monthly payments which had not been remitted for 1973, the letter was premature since by the terms of the note no default could exist as to

that sum until after January 1, 1974. If, instead, the reference was only to the alleged arrearage from 1972, FmHA was, considering the high improbability of refinancing because of the Whites' financial situation, in effect informing the Whites that failure to pay the disputed $22.40 before December 31 would necessitate either selling the property or transferring it to another individual or to the government.

**4.** In Mississippi, nonjudicial foreclosures are authorized by Miss.Code Ann. § 89–1–55 (1970) to be conducted by the trustee named in the deed of trust after first advertising the sale of the real property for three consecutive weeks preceding such sale, in a newspaper published in the county and by posting notice at the courthouse of the county where the land is situated for such period of time. The notice and advertisement shall disclose the name of the original mortgagors in the deed of trust.

the property upon foreclosure on May 13, 1974, the date specified in the notice, to the United States as the highest bidder for the sum of $15,710.85; and the trustee executed a trustee's deed conveying the property to the government. The county supervisor thereafter on several occasions notified Garney White that the property he and his family were occupying no longer belonged to him but was owned by the United States. Despite requests that the borrowers vacate the premises, the Whites declined to do so, thereby causing the present eviction action against them to be filed in this court. On June 14, responding to Taylor's inquiry concerning the validity of the foreclosure, C. G. Deaton, FmHA's State Director, stated that there was no justification for seeking a means for letting the Whites remain in the house since the foreclosure had been "appropriate."[5]

Before addressing the question of waiver, we deem the threshold question to be whether the borrowers' equity interest and consequent right to use a house financed through a government loan constitutes an interest protected by the Due Process Clause of the Fifth Amendment; and, if so, what are the essential elements of procedural due process in the context of foreclosure on the home by a federal agency. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), made clear that the termination of any benefits which are a matter of statutory entitlement held by a qualified recipient brings the due process clause into play and that such benefits cannot be terminated without satisfying minimal procedural safeguards. Indeed, there can be no doubt that the ownership as well as the right to occupy government-subsidized housing is a property interest protected by the Fifth Amendment. *Law v. United States Dep't. of Agri.*, 366 F.Supp. 1233, 1238 (N.D.Ga.1973). See *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474, 483 (1969); *Caulder v. Durham Housing Authority*, 433 F.2d 998 (4 Cir. 1970); *Escalera v. New York Housing Authority*, 425 F.2d 853 (2 Cir. 1970); *Jones v. HUD*, 390 F.Supp. 579, 588 (E.D.La.1974).

The Due Process Clause of the Fifth Amendment, no less than that of the Fourteenth Amendment,[6] mandates two fundamental principles or minimal requirements: (a) adequate notice, and (b) opportunity to be heard or to defend. *Aetna Ins. Co. v. Hartshorn*, 477 F.2d 97, 100 (5 Cir. 1973). To be adequate, notice must be reasonably calculated to reach the interested parties. *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The continual correspondence between the Whites and FmHA dealing with delinquency and, ultimately, with foreclosure, negates any question of the adequacy of notice in the *Mullane* sense, i. e., the method of notice was reasonably calculated to reach the Whites. However, as recognized in *Goldberg*, the process of delineating procedures necessary to implement the notice and hearing requisites of due process when the appropriateness vel non of termination of government benefits is at issue "must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action." *Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307, 1320 (1960); *Goldberg*, supra 397 U.S. at 263, 90 S.Ct. at 1018, 25 L.Ed.2d at 296. We note in this connection that this case is not analogous to those in which harm to the public has been threatened, and the private interest infringed is reasonably deemed to be of less importance, thus permitting administrative termination without a prior evidentiary hear-

---

5. In a letter from Deaton to Taylor dated June 14, 1974, Deft. Ex. 1, Deaton emphasized [t]he foreclosure was held on May 13, and the government was the successful purchaser. The trustee's deed and affidavits of foreclosure proceedings have been recorded and the government has title to the property. The regional attorney has been requested to enter eviction proceedings.    .    .    .

6. As stated by the Tenth Circuit, "[i]t goes without saying that a federal agency may not, consistent with Fifth Amendment due process, do that which a state is forbidden to do by Fourteenth Amendment due process," *Earnest v. Willingham*, 406 F.2d 681, 684 (10 Cir. 1969), appeal after remand, 426 F.2d 466 (10 Cir. 1970).

ing. See, e. g., *Ewing v. Mytinger & Castleberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamins); *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (adoption of wartime price regulations). Conversely, continued use and enjoyment of a home, the purchase of which is made possible by qualifying for an FmHA loan, is at least as important an interest as the welfare benefits discussed in *Goldberg.* See 42 U.S.C. § 1441. Moreover, the government's interest in efficient administration and protecting the public treasury are not sufficiently important to permit FmHA's termination of a borrower's interest without complying with due process principles, absent waiver thereof. Indeed, here, unlike in *Goldberg,* where the Court recognized that "benefits paid to ineligible recipients pending [a] hearing probably cannot be recouped," *Goldberg,* supra, 397 U.S. at 266, 90 S.Ct. at 1019, 25 L.Ed.2d at 298, foreclosure on the property in appropriate circumstances will adequately protect the public treasury.

Succinctly stated, [we conclude that before foreclosure proceedings may be instituted by FmHA] *Goldberg* requires (1) timely and adequate notice detailing the reasons for a proposed [foreclosure], (2) an opportunity on the part of the [borrower] to confront and cross-examine adverse witnesses, (3) the right of a [borrower] to be represented by counsel, provided by him, to delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination and generally to safe-guard his interests, (4) a decision based on evidence adduced at the hearing, in which the reasons for decision and the evidence relied on are set forth, (5) an impartial decision maker [whose findings are subject to plenary administrative review].

*Caulder,* supra at 1005.

■■ These due process rights may, of course, be waived by contract, *United States v. Wynn,* 528 F.2d 1048, 1050 (5 Cir. 1976), or by conduct. *Hoffman v. United States,* 519 F.2d 1160, 1165–66 (5 Cir. 1975).

We note that the nonjudicial foreclosure procedure authorized by the Mississippi Code is not per se unconstitutional. *D. H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Swarb v. Lennox,* 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972). Rather, it provides a means by which contracting parties may dispose of property in case of default. "The nub of the question here . . . is not the lawfulness of the statute, but whether the contractual provision is [made] valid and binding between the parties [by the initial agreement or by subsequent conduct of the borrower]." *Law,* supra at 1239. See *Wynn,* supra at 1050; *Hoffman,* supra at 1165–66.

By agreeing to covenants ¶¶ 17 and 18 of the deed of trust pertaining to acceleration of debt and waiver of personal notice prior to foreclosure, the Whites ostensibly waived their due process rights to notice and hearing. *Wynn,* supra at 1050; moreover, if their ostensible contractual waiver was effective, the borrowers could not now assert a violation of their due process rights to notice and hearing prior to foreclosure. *Id.* Thus, we must determine whether upon executing the deed of trust the Whites effectively waived their due process rights. We conclude that they did not.

■■ In order to establish contractual waiver, FmHA had the burden of demonstrating that the Whites made a voluntary and intelligent waiver of their known due process rights. *Wynn,* supra at 1050. Moreover, this burden is heavy because of the strong presumption against the waiver of constitutional rights. *Gonzalez v. County of Hidalgo,* 489 F.2d 1043, 1046 (5 Cir. 1973). Where, as here, there is substantial inequality of bargaining power between the parties, the borrowers have minimal educational preparation and ability to fully comprehend the acceleration and foreclosure language in a deed of trust, and where such language is not called to their attention and fully explained, no effective contractual waiver of their right to adequate notice and meaningful hearing can exist. Our conclusion of lack of waiver is reinforced by

FmHA's use of standardized forms, not subject to alteration; thus making the loan documents essentially a contract of adhesion, or "on a take it or lease it" basis. See *Wynn,* supra, at 1050; *Gonzalez,* supra at 1046-47.

■ Despite the heavy presumption which exists against the waiver of constitutional rights, see e. g., *Gonzelez,* supra at 1046, the Fifth Circuit has held that due process rights may be waived by the borrower's conduct, *Hoffman,* supra at 1066. *Hoffman,* however, is not controlling here. In *Hoffman,* the Court of Appeals held that the plaintiff homeowners had waived their right to be heard because of their absolute failure to respond to five notices sent monthly prior to foreclosure which contained the government's requests for the borrowers to explain their failure to make mortgage payments. *Hoffman,* supra at 1160. Here, the Whites certainly did not fail to respond, but continued to dispute, individually or through their attorney, FmHA's action. Therefore, we conclude that by their conduct subsequent to entering into the loan agreement with FmHA, the Whites did not waive their rights under *Hoffman* to be heard.

■ Aside from procedural due process, there were certain federal statutory rights which the Whites possessed by virtue of their eligibility for an FmHA rural housing (RH) loan. First, after also qualifying for an interest credit under 42 USC § 1473; 7 CFR § 1890n, review and cancellation of that agreement could be properly accomplished only in accordance with 7 CFR § 1890 n. 5, n. 6. Since the Whites' interest credit was not eliminated as a result of the periodic review of such agreements during October through December, their agreement could be cancelled only upon the occurrence of one of the circumstances described in 7 CFR § 1890 n. 6 (effective October 11, 1972). This regulation provides in relevant part as follows:

(a) An existing interest credit agreement will be cancelled whenever:

(1) The borrower ceases to occupy the housing, or

(2) Liquidation action is initiated against the borrower, or

(3) The borrower sells or conveys title to the property, or

(4) The borrower has had a *substantial* increase in income and is *clearly* able to repay the loan without interest credits, or

(5) The FmHA loan will not be continued with the borrower and the borrower has never occupied the dwelling. Id. (Emphasis added)

Cancellation of the Whites' interest credit was apparently based upon subsection (a)(4); however, absent waiver, the borrower should be allowed to contest the factual basis for FmHA's determination that a substantial increase in income clearly enables him to repay the loan without the interest credit. See *Caulder,* supra at 1005; *Gonzalez,* supra at 1046-47. Moreover, the Whites had a right to put forth their claim for a moratorium on loan and interest payments under 42 USC § 1475 in the meaningful evidentiary hearing mandated by *Goldberg.* See *Pealo v. FmHA,* 361 F.Supp. 1230 (D.C.D.C.,1973); 42 USC § 1441. Furthermore, FmHA has the responsibility to service the real estate in a manner which will accomplish both the loan objectives as well as protect the government's financial interest. 7 CFR § 1872.1(b). This section also provides that

[t]o accomplish these purposes, the real estate security will be serviced in accordance with the security instruments and any related agreements . . . so long as the borrower has reasonable prospects for accomplishing the loan objective, continues to make payments on the loan in accordance with his ability, properly maintains and accounts for the security, and otherwise meets the loan obligation in a satisfactory manner. Id. See also 42 USC § 1476(a).[7]

7. § 1476(a) (1970) provides:

In connection with financial assistance authorized in this subchapter, the Secretary shall require that all new buildings and repairs financed under this subchapter shall be substantially constructed and in accordance with such building plans and specifications as may be required by the Secretary. Buildings and re-

■ Obviously, meaningful consideration of the Whites' moratorium request would be intricately related to proper resolution of their assertion that FmHA had failed to meet its duty outlined in this regulation. We also are mindful that the objective of FmHA rural housing loans is "the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family. . . ." 42 USC § 1441. Moreover, FmHA is directed to exercise

> "its powers, functions and duties with respect to housing . . . consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established." Id.

We hold that the Whites did not waive their right to assert any of these federal statutory rights. The inexorable conclusion is that where procedural due process rights—the means through which substantive rights are vindicated—are not waived in the face of a continued, though unsuccessful, attempt to have substantive rights reviewed in a meaningful hearing, there can be no waiver of those substantive rights. See *Gonzalez,* supra. Any other conclusion upon the facts presented here would improperly serve to frustrate the congressionally mandated objectives of the Housing Act of 1949. *Pealo,* supra at 1324; 42 U.S.C. § 1441.

■ Finally, we conclude that the procedure actually utilized by FmHA in this case does not pass constitutional muster. Where, as here, disputes exist as to the proper performance by FmHA and the borrowers of their respective obligations under a rural housing loan agreement, it is constitutionally impermissible to commence action which will lead inevitably to foreclosure before the borrower has been given notice and opportunity to defend in a meaningful evidentiary hearing, *Caulder,* supra at 1005. According to FmHA's county supervisor, the January 29, 1974 hearing was useless, an observation supported by the facts of this case; as such it was meaningless and, therefore, constitutionally unacceptable. Moreover, when disputes such as those between the Whites and FmHA exist, it is only in the context of adequate notice and meaningful hearing, absent waiver thereof, that federal statutory rights under the Housing Act related to those disputes may be properly implemented.

We hold, therefore, that the foreclosure sale of the Whites' property, being accomplished without a viable opportunity for prior hearing, was constitutionally impermissible as well as contrary to statutory requirements. This requires the court to set aside the foreclosure sale and cancel the trustee's deed conveying the residence to the government. We hold further that the Whites shall be allowed an opportunity to present their several claims to local FmHA officials, upon appropriate notice, in a meaningful evidentiary hearing subject, if necessary, to full administrative review of any decision adverse to their interests.

---

pairs constructed with funds advanced pursuant to this subchapter shall be supervised and inspected, as may be required by the Secretary, by competent employees of the Secretary. In addition to the financial assistance authorized in this subchapter, the Secretary is authorized to furnish, through such agencies as he may determine, to any person, including a person eligible for financial assistance under this subchapter, without charge or at such charges as the Secretary may determine, technical services such as building plans, specifications, construction supervision and inspection, and advice information regarding farm dwellings and other buildings.

Therefore, there was ample statutory authority for local FmHA officials to act to ensure that White's home was constructed in compliance with their contract.