Lorene SADLER, Individually and on behalf of all others similarly situated.

Cecilia Hutchings et al., Intervenors,

v.

The 218 HOUSING CORPORATION et al.

Civ. A. No. 75–32A.

United States District Court,
N. D. Georgia,
Atlanta Division.

July 26, 1976.

Myron N. Kramer, Richard D. Ellenberg,
Atlanta, Ga., for plaintiffs.

Lewis Cenker and David K. Whatley, Smith, Cohen, Ringel, Kohler & Martin, John W. Stokes, Jr., U. S. Atty., Richard A. Horder, Asst. U. S. Atty., Dana E. McDonald, U. S. Dept. of Housing and Urban Development, Atlanta, Ga., George M. Fleming, Trial Atty., Dept. of Justice, Washington, D. C., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is an action brought by low-income residents of a federally-subsidized housing project, known as Rockdale Apartments, seeking to enjoin implementation of a May 6, 1976, decision by the United States Department of Housing and Urban Development [hereinafter "HUD"] to demolish the 335-unit complex. Plaintiffs are familiar litigants in this court, although their posture has changed somewhat since commencing the instant litigation. When their complaint was originally filed, plaintiffs attacked the deplorable condition of their apartment project on the grounds that the named defendants had collectively failed to provide plaintiffs with decent, safe, and sanitary living conditions in contravention of the due process clauses of the Fifth and Fourteenth Amendments, the National Housing Act, and state and local law. Plaintiffs now contend that they are entitled to an injunction against the proposed *destruction* of the project on four grounds: (1) that HUD failed to comply with the National Environmental Policy Act of 1969, 42 U.S.C. § 4331, *et seq.*, in reaching its decision to demolish; (2) that HUD failed to afford the resident plaintiffs with notice and an opportunity to be heard in connection with the decision to demolish in contravention of the due process clause of the Fifth Amendment;[1] (3) that HUD violated the provisions of the National Housing Act, 12 U.S.C. § 1701, *et seq.* by applying a purely *economic* standard in determining that the project should be demolished; and

(4) that HUD violated the fair housing provisions of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601, *et seq.*, by failing to make prior studies on the racial effect and impact of its decision. On June 11, 1976, this court held a full evidentiary hearing to consider plaintiffs' motion for a preliminary injunction. The action is presently pending before the court on plaintiffs' request for preliminary injunctive relief, and on plaintiffs' motion to amend the complaint.

## PLAINTIFFS' MOTION TO AMEND

On May 18, 1976, plaintiffs moved to amend their complaint to allege claims arising under the National Housing Act, NEPA, and the Fair Housing Act, and to amend their prayers for injunctive relief consistent with these claims. While it is clear that the court never formally granted plaintiffs' motion to amend, the court permitted plaintiffs to present evidence on such claims at the evidentiary hearing held before this court. Accordingly, plaintiffs' motion to amend their complaint is hereby GRANTED.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

Plaintiffs contend that HUD violated the National Environmental Policy Act, 42 U.S.C. § 4331, *et seq.* [hereinafter "NEPA"] on the grounds that: (1) HUD made the decision to demolish Rockdale without completing the environmental review procedures contemplated by NEPA, and in particular, plaintiffs attack HUD's failure to file an environmental impact statement, 42 U.S.C. § 4331(b)(1); (2) that HUD concerned itself only with the possible *adverse* effects of demolition, whereas NEPA requires that all potential economic and social effects be considered; and (3) that HUD failed to consider alternatives to demolition.

[1]. At the evidentiary hearing, plaintiffs submitted no evidence with respect to their due process claims and the court, accordingly, has not considered such claims with respect to plaintiffs' entitlement to injunctive relief. Moreover, similar claims have been authoritatively rejected in the well-reasoned opinion of Judge Rubin in *Jones v. United States Department of Housing and Urban Development*, 390 F.Supp. 579, 588–89 (E.D.La.1974), and this court finds that that decision is dispositive of the due process claims raised herein.

Plaintiffs appear to have somewhat modified their request for injunctive relief in light of the evidence submitted at the evidentiary hearing. Thus, as originally filed, their motion sought an injunction against demolishing the project, pending the completion of a full environmental impact statement; however, it now appears that plaintiffs seek, at the very least, to enjoin demolition pending the amendment of the Special Environmental Clearance to reflect study into the question of whether demolition of Rockdale will further exacerbate the purported dearth of low and moderate-income housing in the Atlanta metropolitan area. Before turning to the merits of the instant motion, some review of the salient facts appearing of record and adduced at the evidentiary hearing is warranted.

On March 5, 1975, as a result of foreclosure and sale HUD became the owner of Rockdale Apartments. As a result of the action brought by plaintiffs herein attacking the deplorable condition of the property on statutory and constitutional grounds, the parties entered into a consent order requiring HUD to complete its environmental review process to determine whether it would rehabilitate Rockdale. *Lorene Sadler, et al. v. The 218 Housing Corporation, et al.,* Civil Action No. 75–32A (N.D.Ga. Oct. 9, 1975).

Section 102 of NEPA provides that all "major Federal actions significantly affecting the quality of the human environment must be accompanied by a detailed statement assessing the environmental impact of the proposed action," [hereinafter "environmental impact statement" or "EIS"]. 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality (C.E.Q.) created pursuant to the Act, and charged with overseeing implementation of NEPA, promulgated guidelines directing federal agencies to establish their own procedures to identify those actions requiring environmental impact statements. 36 Fed.Reg. 7724. *See* 40 C.F.R. § 1500.3(a).

In 1971, HUD promulgated such regulations, and in accordance with such regulations and pursuant to previous orders of this court, undertook a "Special Environmental Clearance" of the project.[2] As a result of an environmental assessment conducted in 1975, the Area Director of HUD, defendant Hartman, made an initial decision on October 11, 1975, that the project should be rehabilitated. Thereafter, while in the process of implementing that decision and setting a timetable for rehabilitation, a study by an independent architectural and engineering firm disclosed that there were significant expenses that had not been considered in connection with the first environmental clearance. This independent study disclosed that the cost to rehabilitate Rockdale would be approximately $1.4 million, or approximately $300,000.00 in excess of the original estimate. As a consequence, a second environmental review was conducted to consider the environmental effect of demolition of the project; defendant Hartman, after receipt of the new cost figures, concurred in the subsequent staff recommendation that the project be demolished, "*subject to the completion* of the environmental review process which had already begun."[3] It is undisputed that defendant

---

**2.** HUD Circular 1390.1 establishes certain "thresholds" that are used to isolate those projects that may be major federal actions significantly affecting the quality of the human environment. A project passing the first threshold is then given special environmental consideration and study and must be thoroughly investigated. After the environmental review is completed the HUD office must file either a "negative statement" indicating that approval of the project application is consistent with established environmental policies and has no significant impact on the environment; if, however, unresolved environmental issues or concerns remain, the agency must draft and circulate a detailed environmental impact statement.

In the instant case, since the proposed action involved more than 100 units, a "Special Environmental Clearance" was required. HUD Handbook guidelines state that if unresolved environmental issues remain, a detailed environmental impact statement must be drafted and circulated. *See generally, Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir. 1973).

**3.** Plaintiffs have also argued that this language indicates that HUD had, in fact, made the decision to demolish the project *prior* to the completion of the environmental review process,

Hartman, on April 30, 1976, in recognition of the possible adverse effects of relocation on the current residents of the project directed his staff to prepare a plan to provide moving assistance to existing Rockdale residents to be included as part of the special clearance. Among other things, that study indicated that there were adequate vacant units of comparable size and rent and of superior quality into which the current Rockdale tenants could be relocated. On May 6, 1976, after completion of the Special Environmental Clearance, HUD issued a negative impact statement or "Finding of Inapplicability", stating that destruction of Rockdale would pose no significant environmental impact, reasoning "that demolition of 325 Units is under the 500 unit threshold requiring an environmental impact statement." See *Handbook of Departmental Policies, Responsibilities and Procedures for Protection and Enhancement of Environmental Quality,* HUD Circular 1390.1 [hereinafter "Handbook"]. *See* note 2, *supra.*

At the evidentiary hearing, plaintiffs challenged the sufficiency of HUD's environmental review, primarily upon the grounds that HUD had failed to ask the right questions in conducting its environmental review; that is, plaintiffs contended that HUD failed to consider a purported dearth of low and moderate-income housing when it decided to demolish Rockdale. Moreover, plaintiffs further contend that HUD, while giving lip-service to alternative courses of action, in reality, failed to meaningfully consider viable alternatives to demolition. Finally, plaintiffs challenged the failure of HUD to consider what the Rockdale property might be used for in the event that it was left vacant by demolition. However, the court pretermitted such arguments on the grounds that it was evident that plaintiffs lacked standing to challenge the future uses of the property, in the absence of any concrete plan or proposal. *See Jones v. United States Department of Housing and Urban Development,* 68 F.R.D. 60, 68 (E.D.La.1975).

Plaintiffs' principal witness was Eugene Harold Bowens, who is president of Interfaith, Inc., a non-profit organization which seeks low-income housing opportunities and participates in the management of such projects. Mr. Bowens stated that in addition to his organization, there were several other organizations of its type in the Atlanta area that might have been willing to assume management of Rockdale, but that neither his organization nor to the best of his knowledge, any other organization had been contacted by HUD to determine whether they would be willing to operate Rockdale. The most significant portion of Mr. Bowens' testimony, however, dealt with the current inadequacy of decent, low and moderate-income housing in the Atlanta metropolitan area as evidenced by a 1974 study conducted by the Atlanta Regional Commission.[4] In light of his experience in

and that the subsequently filed "Special Environmental Clearance" was completed merely as a formality. However, review of the entire record in this case indicates that the April 27 decision to demolish was merely *tentative* and made in order to comply with HUD's commitment to this court that it would advise the court of its decision on April 27.

Moreover, plaintiffs also contended that the language in the April 27 concurrence further indicates that the agency was improperly concerning itself solely with *adverse* impacts of the proposed agency action, when it is clear that "all potential environmental effects" must be considered. *Hiram Clarke Civic Club, Inc. v. Lynn, supra,* at 427. This court agrees with plaintiffs that HUD has a duty to consider all environmental impacts, and not merely those which have an adverse effect on the quality of the environment; however, review of the final

"Special Environmental Clearance" and the attached "worksheets" indicate that HUD did not merely consider adverse impacts in proceeding to the decision to demolish.

4. The January, 1974, "Housing Profile" published by the Atlanta Regional Planning Commission indicated, among other things that there were nearly 10,000 people in the Atlanta region on the waiting lists for public housing, and that by 1975 it was expected that more than a third of the region's inhabitants would not even be able to purchase a $20,000.00 house. The study further showed that 80% of the public housing in the region was concentrated in the City of Atlanta. Finally, the study indicated that with respect to the region as a whole, 89% of the total need for housing was in the low and moderate-income range, while within the City of Atlanta 57% of the total need was for that type of housing.

the housing area and experience as a member of that Commission, Mr. Bowens further testified that the decision to demolish Rockdale violated several of the housing goals set by the Commission, including the purpose and policy to assure an adequate housing supply, preservation of the existing housing stock, and the policy that low and moderate-income housing should not be destroyed until replacement housing is available.

On the other hand, Mr. Harold Kopp, Deputy Director of Housing Management with HUD testified that in that position he had a significant input in the ultimate decision that Rockdale be demolished. Mr. Kopp testified, that as Chief of Property Disposition, he deals particularly with distressed properties and that in examining the history of Rockdale's operations as well as projections of its future earnings in the event of rehabilitation, he determined that continued operation of the project by HUD was not economically feasible. He further testified that economic factors played "a very important part" in his analysis, but that these were not his sole considerations. For example, Mr. Kopp stated that there was a fear entertained by HUD officials that destruction of Rockdale might jeopardize the entire urban renewal program, and that, therefore, responsible HUD officials considered at least six alternatives to destruction, and searched for other available sources of income that might ensure continued operation. All of these alternatives had to be rejected for one reason or another.

To illustrate, Mr. Kopp testified that HUD contemplated that Rockdale might be converted into "Section 236" housing, see 12 U.S.C. § 1715z–1, but that such an alternative had to be ruled out because Rockdale did not comply with the applicable rules, regulations, and policies of that section. Similarly, HUD officials contacted the Atlanta Housing Authority, but officials there stated that they could not use the property for public housing. Moreover, conversion of the property into Section 8 housing, see 42 U.S.C. § 1430, also had to be rejected, because site regulations could not be complied with; that is, Rockdale, because of its proximity to Perry Homes, a similar low-income and primarily black project, was in a racially impacted area in contravention of the purposes of Section 8 supplements to disperse low-income tenants throughout the general population. Similarly, Mr. Kopp stated that he considered whether the property might be sold on a "cash as is" basis to private purchasers who might continue to operate the project. That alternative was rejected because it was evident that any purchasers of the property would encounter the same financial difficulties that HUD had experienced. Thus, HUD officials considered it unlikely that any profit-motivated private purchaser would repair and rehabilitate the project because of the exorbitant cost involved. Therefore, HUD concluded that private operation would have undoubtedly perpetuated the character of Rockdale and the surrounding environs as a slum; therefore, demolition was preferable and would have had a less deleterious effect on the quality of the environment. Finally, Mr. Kopp also stated that thought was given as to whether the property might be donated to a non-profit "eleemosynary" organization, but that he was unaware of any organizations that would be willing or capable of handling the management of a project of the magnitude of Rockdale.

In addition to presenting evidence tending to show that alternatives to demolition had been considered. HUD also produced witnesses who testified that HUD officials were aware that demolition of Rockdale would have significant impact on the current tenants, in the sense that they would have to be relocated and would suffer from whatever traumas are normally attendant upon such dislocation; however, these witnesses testified that HUD specifically planned a relocation program in cooperation with the Atlanta Housing Authority as part of the environmental clearance in order to ensure that relocation would be handled with a modicum of adverse effects on the individual plaintiffs. The evidence also indicated that the Rockdale residents would be able to relocate into housing of compara-

ble size and rent, but of a superior quality than that in which they had resided at Rockdale.

Thus, the gravamen of plaintiff's complaint is that HUD, in reaching its ultimate decision to demolish Rockdale, failed to consider the far-reaching impact of the destruction of over 300 housing units in an urban market which it contends has a deficient supply of similar low and moderate-income housing, but rather, merely considered the primary impact of destruction on its current residents. *See generally, Maryland-National Capital PK. & PL. Com'n v. United States Postal Service,* 159 U.S.App. D.C. 158, 487 F.2d 1029 (1975).

As an initial matter, the court notes that the parties are in agreement that the agency's threshold determination not to file an environmental impact statement because the federal action is not significant is to be governed:

> by a stricter *"reasonableness standard"*, instead of by the well-settled rule that, in the absence of fraud, administrative findings of fact are conclusive if supported by any substantial evidence.

*Hiram Clarke Civil Club, Inc. v. Lynn,* 476 F.2d 421 (5th Cir. 1973) [hereinafter *"Hiram Clark"*]; *Save Our Ten Acres v. Kreger,* 472 F.2d 463 (5th Cir. 1973) [hereinafter *"SOTA"*] *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975). The spirit of NEPA would be violated if "an ex parte decision that a project was minor or did not significantly affect the environment were too well shielded from impartial review." *SOTA, supra,* 472 F.2d at 466; *Hiram Clarke, supra,* 476 F.2d at 424–25.

Together with the review standard first set forth in *SOTA* and its progeny, is a procedural outline detailing the manner in which judicial review of the agency's decision is to be governed. In the first instance, to be entitled to judicial review, plaintiffs must allege "facts which, if true, show that the recommended project would *materially degrade any aspect of environmental quality." SOTA, supra,* 472 F.2d at 466 (emphasis supplied). This prerequisite is designed to assure that courts will only

be required to review projects where plaintiffs raise *substantial environmental issues. Hiram Clarke, supra,* at 425. Applying that standard to the facts herein, it can be concluded that the purported inadequacy of low-income housing raises substantial environmental issues warranting further consideration by the court. *See, e. g., SOTA, supra* (severe parking and traffic congestion problems, and improper location of buildings on flood plain required evidentiary hearing); *Jones v. United States Department of Housing and Urban Development,* 390 F.Supp. 579 (E.D.La.1974) (change in land use on housing conditions within the city, change in income characteristics of the area's residents, traffic congestion); *Maryland-National Capital Pk. Planning Comm'n, supra* (deviation from prior land use and zoning policies, parking problems); *McDowell v. Schlesinger,* 404 F.Supp. 221 (W.D.Mo.1975) (transfer of 7,500 civilian employees pursuant to relocation of air force base would result in significant impacts, including social and economic activities, problems of law enforcement, fire protection, public utilities, and overall growth and development patterns); *Morgan v. United States Postal Service,* 405 F.Supp. 413 (W.D.Mo.1975) (proposed parking facility had effect on land use and zoning, previous residential character of neighborhood, and drainage problems).

Since plaintiffs herein have raised substantial environmental issues concerning the proposed recommended demolition herein, it is incumbent upon the court to proceed to determine whether "the agency reasonably concluded that the [proposed action] would have no effects which would significantly degrade our environmental quality." *SOTA,* 472 F.2d at 467; *Hiram Clarke, supra,* 476 F.2d at 425. In order to make this determination, the court need not hold an evidentiary hearing, unless, of course, plaintiffs have shown an inadequate evidentiary development before the federal agency. *Id.*

Review of the special environmental clearance *sub judice* and other data comprising the agency record indicates that HUD did consider the adequacy of the

present stock of low-income housing units available to absorb *these* particular plaintiffs, and further that the agency took painstaking steps to ensure that relocation could be accomplished with a minimum of associated relocation traumas. On the other hand, it is somewhat unclear as to whether the agency considered what might be termed secondary impacts of the decision to demolish, that is, the alleged exacerbation of critical shortage in the relevant housing market, or whether HUD had a duty to consider such effects. Accordingly, this court held an evidentiary hearing to supplement the agency record and to allow the parties an opportunity to present their legal theories.

The initial question facing this court, then, is whether HUD was required to consider the far-reaching impacts of demolition on the putative housing shortage or whether it was sufficient that it consider only the immediate environmental impacts with respect to these particular plaintiffs. Plaintiffs rely to a considerable extent on highway construction cases which apply the so-called "segmentation" theory in determining whether federal government action has a significant impact on the quality of the human environment; the focus of the inquiry in such cases is whether a section of proposed construction is merely a "segment" of a larger project, and the larger project has identifiable and significant environmental impact, with the result that an environmental impact statement will be required prior to the proposed construction. *E. g., Hawthorn Environmental Preservation Association v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.1976); *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department,* 496 F.2d 1017 (5th Cir. 1974). These decisions hold, as a general rule, that the government or other cooperating state agencies may not arbitrarily divide federal highway projects into artificial segments in order to circumvent the requirements of NEPA. This court is inclined to agree, however, with the several courts that have already rejected the segmentation theory as not strictly apposite where the proposed action is in the housing or urban renewal context, noting, for example, that the segmentation effect "is easy to visualize in a highway context" since "[a] highway segment must begin and conclude in some logical place"; thus, where a proposed highway is planned to link "civilization to nowhere" an "EIS covering that section is too narrow in scope." *Citizens Against the Destruction of NAPA v. Lynn,* 391 F.Supp. 1188, 1194 (N.D.Cal. 1975); *Chick v. Hills,* 528 F.2d 445 (1st Cir. 1976); *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973).

Moreover, the analogy to highway construction segmentation decisions can be seen to have even less applicability when the issue before the court is primarily one of *destruction* of existing projects, rather than *construction*,[5] of proposed ones.

---

**5.** In *Citizens Against the Destruction of NAPA v. Lynn, supra,* the District Court for the Northern District of California did, by analogy, apply the segmentation theory in making a determination as to whether an environmental impact statement covering only a three-block area of an eight-block redevelopment plan was too narrow in its scope to comply with the NEPA. The court, in extrapolating from the highway "segmentation" decisions noted that essentially two tests had been posited in that area: (1) the coercive effect test, under which courts looked to whether a federal or federalized highway segment would coerce the construction of another segment, *see, e. g., Named Ind. Mem. of San Antonio Conservation Society v. Texas Highway Dept.,* 466 F.2d 1013 (5th Cir. 1971), *cert. denied,* 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136; and (2) the "nexus" or "independent justification" approach in which

the court's analysis focuses on whether a small project, which is undeniably a portion of a much larger governmental undertaking has such a substantial local purpose that it can stand alone and serve the community, without the larger project, *see, e. g., Sierra Club v. Froehlke,* 359 F.Supp. 1289 (S.D.Tex.1973), *rev'd sub nom. Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974); *Citizens for Balanced Environ, Transp., Inc. v. Volpe,* 376 F.Supp. 806, 813 (D.Conn.1974). In *Citizens Against the Destruction of NAPA,* the court held that while completion of the three-block area would not coerce construction of the entire redevelopment area, the three-block area did not have an independent justification.

As noted in the body of the opinion, this court sincerely doubts the usefulness of the segmentation analysis when the question be-

Interestingly, HUD has challenged plaintiffs' basic contention that HUD failed to consider housing shortages in reaching the decision to demolish. In particular, HUD points to certain statements made by Mr. Reardon in connection with the initial determination that Rockdale should be rehabilitated, that recognized that there was a need for low-income housing in the Rockdale area. In sum, HUD argued:

> Two witnesses for HUD [Messrs. Reardon and Cobb] testified that the October 11 rehabilitation decision was based upon social factors, specifically mentioning the need for housing units in the area. In fact, the rehabilitation decision makes little sense, *but for* this identified need, as the agency had concluded that rehabilitation was not the most economical approach. Even the Special Clearance here called into question implicitly recognizes this factor. In discussing the alternative of demolition, the clearance concludes that the project area "is not conducive to a high density residential project." The clearance notes that the area suffers from an "overly concentrated subsidized housing problem."

HUD's contentions in this respect are meritorious. Thus, it is clear that HUD considered the availability of comparable or superior low-income housing for present tenants of Rockdale before finally reaching the decision to demolish, and that the purported housing shortage was not so acute as to prevent plaintiffs' successful relocation. To whatever extent, if any, HUD failed to consider the breadth of housing problems suggested by plaintiffs, such failure must be viewed in light of the reasonableness of the agency decision as a whole, as well as in light of certain inchoate standing problems under which plaintiffs themselves may suffer.

■ In order to challenge agency action on environmental grounds, it is well settled that plaintiffs must satisfy a two-fold *standing* test: (1) that the challenged action has or will cause them injury in fact and (2) that the alleged injury is to an interest "arguably within the zone of interests to be protected or regulated by the statutes" that plaintiff claims the agency has violated. *United States v. S.C.R.A.P.,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Moreover, in the *S.C.R.A.P.* decision, the Supreme Court held that the plaintiff's burden of pleading individual economic, recreational, and aesthetic harm would be satisfied by allegations "that he has been or will in fact be *perceptibly harmed* by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." *Id.* 412 U.S. at 689–90, 93 S.Ct. at 2416 (emphasis supplied). In reaching that conclusion, the Court rejected the argument that plaintiffs must show that they are "significantly" affected by agency action, noting that the "injury in fact" test in the standing context reflects the requirement that "a person be 'adversely affected' or 'aggrieved' and it serves to distinguish a *person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem."* Id. at 689 n. 14, 93 S.Ct. at 2417. Thus, in the environmental context, it is evident that the standing question turns upon whether plaintiffs have alleged an individualized adverse impact or direct injury to their environmental interests. In the instant case, it can be persuasively argued that plaintiffs have failed to allege any direct or individualized housing needs that would arise from destruction of Rockdale, except, of course, to the extent that they must find immediate housing and

---

fore the court is the proposed *demolition* of a project rather than proposed construction. However, even if this court were to apply the coercive effect test and carry it to its logical conclusion, it could not reasonably be argued that demolition of Rockdale and displacement of its current residents would coerce the construction of other housing facilities, unless, of

course, there was an inadequate housing pool to absorb *these* particular plaintiffs. That contingency, however, has not been demonstrated in this case. In any event, this court is of the opinion that the segmentation approach is best designed as an analytical tool in highway cases or at least where the issue is one of proposed construction.

will suffer from any inconveniences associated with dislocation. However, while it appears that their immediate housing needs are not absolutely guaranteed by HUD, considerable efforts have been made to relocate them in comparable, if not superior housing and to provide them with funds to minimize, if not completely cover, their moving expenses.

In light of the extensive relocation activities undertaken by HUD and the undisputed evidence that similar low-income housing is available, plaintiffs' particularized fears as to an area-wide housing shortage are too speculative to have "perceptibly harmed" them in the sense that they should be granted standing to challenge HUD's decision on such grounds. Cf. *Jones v. H. U. D., supra,* 68 F.R.D. at 62.

In any event, even assuming arguendo that plaintiffs could surmount the obstacle of the standing requirement, this court is compelled to conclude that the agency's decision to demolish was "reasonable" as that standard has been applied in *SOTA* and its progeny. In fact, the recent decision of *Jones v. United States Department of Housing,* 68 F.R.D. 60 (E.D.La.1975) is almost clearly on point. In a well-reasoned decision, Judge Rubin concluded that HUD's decision to demolish an apartment project was "reasonable" and would not be enjoined pending the filing of an environmental impact statement, based on the following facts:

> The evidence demonstrates [that demolition will not significantly and adversely affect any factor in the human environment;] the Parkchester buildings could not have been economically rehabilitated; their continued existence is a danger to the community; low income housing units available would absorb the actual, human dislocation caused by demolition of the project. For these reasons, no environmental impact statement need be filed with respect to the abandonment and demolition of the project.

*Id.* at 62.

Similarly, in the instant case, the overwhelming evidence shows that the Rockdale Apartments had deteriorated into such a condition that the units were almost uninhabitable; that less then ten percent of the units were in fact occupied; that the cost to rehabilitate such units was prohibitive; that even if the units were rehabilitated, they would be unable to be maintained on a self-sustaining basis without resort to other sources of income which were unavailable primarily because of the location and character of the project. The evidence fully sustained HUD's contentions that the current tenants of Rockdale could, through the use of Section 8 housing subsidies, be relocated into units of comparable size and rent and of a superior quality. Further, the evidence showed that the use of Section 8 housing would allow dispersal of the low-income residents throughout the general community and to some extent ameliorate the over-concentration of blacks and low-income residents in the geographic area in which Rockdale and Perry Homes is located. In sum, the final determination to demolish Rockdale does not represent an unreasonable decision founded wholly upon economic considerations; on the contrary, the whole decision-making process is permeated with the soul-searching of responsible HUD officials to make a decision that would not adversely affect the quality of the human environment, in light of the alternatives that were available. Accordingly, this court concludes that HUD's decision that there was no significant environmental impact was not unreasonable under the circumstances, and that the agency was, therefore, not required to file an environmental impact statement prior to demolition.

### VIOLATIONS OF THE NATIONAL HOUSING ACT AND THE FAIR HOUSING ACT OF 1968

Much of the court's discussion concerning the purported failure of HUD to comply with the NEPA is relevant to and inextricably tied to the plaintiffs' claims based on the violation of the National Housing Act and the Fair Housing Act of 1968. Plaintiffs' National Housing Act claims are predicated upon their contention

that decisions to demolish existing housing should not be based solely upon economic factors, without reference to the primary purpose of the National Housing Act "to provide adequate, decent, and sanitary housing" for Americans who, without governmental aid, lack the financial means of providing such housing. *Cole v. Lynn,* 389 F.Supp. 99 (D.D.C.1975). *See generally, Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Thus, it is well settled that HUD has an affirmative obligation to follow the policies set up by the National Housing Act. *Shannon v. United States Department of Housing and Urban Development,* 436 F.2d 809 (3d Cir. 1970); *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848, 855 (D.C. Cir. 1974); *Cole v. Lynn, supra,* at 102. However, there exists, of course, "broad discretion of the agency to choose between alternative methods of achieving national housing objectives." *Shannon v. HUD, supra,* at 819; *Commonwealth of Pennsylvania v. Lynn, supra.* The wide latitude of discretion which HUD is granted under the National Housing Act would, by necessity, include consideration of its affirmative obligations "to administer the programs and activities relating to housing and urban development in a manner . . . to further" the policies of non-discrimination in housing consistent with Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3608(d)(5). *See Commonwealth of Pennsylvania v. Lynn, supra,* at 855 n. 23; *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1133–34 (2d Cir. 1973). Under the fair housing provisions, it has been uniformly held that it is impermissible for governmental agencies to confine and isolate low-income blacks to racially compacted and concentrated areas. *Crow v. Brown,* 332 F.Supp. 382 (N.D.Ga.1972), *aff'd* 457 F.2d 788 (5th Cir. 1972); *Norwalk Core v. Norwalk Redevelopment Agency,* 395 F.2d 920 (2d Cir. 1968).

Plaintiffs have contended that HUD considered only economic factors in deciding to demolish Rockdale, without full consideration of alternatives; thus, they contend that this case falls squarely within the teachings of *Cole v. Lynn, supra.* We wholly disagree with plaintiffs' contentions in this respect, since review of the salient facts as set forth by the court in *Cole v. Lynn* shows that they are clearly distinguishable:

> HUD considered several alternatives to demolition consisting of various permutations of partial rehabilitation and rent supplements. In each case, insufficient economic subsidies were available to insure economic feasibility without risks that "would not be in the best interests of the Secretary" and therefore it was decided that there was "no alternative" to demolition.

> . . . . .

> When HUD demolition plans became known, tenants were under increasing pressure to leave, vandalism increased and gradually the whole project became moribund except for a few families that still remain, *presumably due to inability to find comparable living arrangements. Those who felt obliged to leave have found inferior quarters at higher rent. Indeed, no comparable low-income housing of equal quality was available to any of the tenants at the time the demolition decision was made.* In fact, at all relevant times herein, there has been an acute housing shortage in the District of Columbia, which has been particularly serious for low-income persons with large families, the very class Sky Tower serves. Thus NCHA has a current waiting list of over 4,000 families, concentrated in the four-bedroom or larger category. Only one other HUD-assisted project in the District of Columbia metropolitan area has any six-bedroom units whatsoever.

*Cole v. Lynn, supra,* at 101 (emphasis supplied). In a similar vein, the district court in *Cole v. Lynn* noted the "anomalous" situation that HUD, the agency directed by Congress to eradicate slum-like areas "propose[d] to wreck and demolish eight low-income apartment buildings containing 63 apartments which were recently renovated at a net 'sunk' investment of over $2 million

in Government money and are now occupied by low-income tenants." 389 F.Supp. at 102. Finally, the evidence in *Cole v. Lynn* indicated that HUD had failed to consider alternatives, including the availability of Section 8 subsidies or donating the project to a responsible government or private group that might continue to operate the project with or without government assistance. Contrary to the assertions of plaintiffs here, it is clear that HUD specifically considered the availability of Section 8 subsidies, *see* 42 U.S.C. § 1430, but was forced to reject that program as an alternative because the site and neighborhood standards established under that program require that "the site shall promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of assisted persons." 24 C.F.R. § 881.112. In fact, the Atlanta Area Office of Equal Opportunity had previously rejected Rockdale as an appropriate site for substantial rehabilitation pursuant to Section 8, because of the over-concentration of black and low-income residents. Finally, *Cole v. Lynn* is further distinguishable on the grounds that the facts herein show that the units at Rockdale are barely inhabitable, almost completely vacant, and there exists adequate housing of comparable or superior quality to absorb the human dislocation caused by demolition. In sum, this court is compelled to conclude that HUD's decision to demolish was reached only after full consideration of the alternatives, was not based solely on economic factors, and was wholly consistent with its obligations under the National Housing Act.

Plaintiffs' claims predicated upon their assertion that HUD failed to consider "racial" factors and impact on the decision to demolish are somewhat curious in light of the undisputed evidence showing that the area in which Rockdale is located is already racially impacted by reason of its proximity to Perry Homes, a similar but considerably larger low-income and racially-concentrated subsidized housing project. Recent decisions of the Supreme Court, as well as other federal courts, indicate that the goal of providing decent and sanitary housing cannot be implemented in a vacuum, without further reference to the ultimate goal that protected minorities or those with inadequate incomes be dispersed throughout the population as a whole and not be confined to ghetto-like barrios whose occupants are solely those who receive some form of government subsidies. *See generally, Hills v. Gatreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) (it was appropriate for district court, in connection with implementation of funding of public housing, to order HUD and Chicago Housing Authority to create housing alternatives outside Chicago's city limits); *Nucleus of Chicago Homeowners Association v. Lynn*, 524 F.2d 225 (7th Cir. 1975). In conclusion, this court is certainly not inclined to rule that HUD's decision to demolish Rockdale is inconsistent with its obligations under the National Housing Act or Title VIII of the Fair Housing Act of 1968, when the record affirmatively demonstrates that HUD officials have done their utmost to take action consistent with current housing policies.

## REQUEST FOR PRELIMINARY INJUNCTION

▉▉▉▉ As evidenced by the discussion above, it is evident that plaintiffs' entitlement to injunctive relief is primarily predicated upon its NEPA claims, based upon HUD's failure to file an environmental impact statement. This court has already concluded that the agency's decision to demolish and its determination that demolition would pose no significant environmental impacts was reasonable under the circumstances. Even if this court were to assume arguendo that plaintiffs have established that HUD failed to consider a factor which may have a significant impact on the quality of the human environment, this court would, nevertheless, be constrained to conclude that plaintiffs would not be entitled to injunctive relief. Thus, although NEPA provides a new statutory basis for injunctive relief against proposed governmental action, the general requirements for a preliminary injunction (even in suits grounded upon the failure to file an impact

statement) has not been altered by the Act. *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir. 1974); *Blackshear Residents Organization v. Romney,* 472 F.2d 1197 (5th Cir. 1963). Thus, it is incumbent upon a plaintiff seeking injunctive relief to prove: (1) a substantial likelihood that he will prevail on the merits; (2) a substantial likelihood that plaintiff will suffer irreparable injury if the injunctive relief is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the injunction will not disserve the public interest. *Id.* at 572; *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975). In sum, merely because HUD may have not fulfilled its duties under NEPA does not *ipso facto* warrant injunctive relief against all further action to accomplish the closing and demolition of Rockdale until HUD complies with the requirements of the Act, if plaintiffs have not shown the traditional prerequisites to injunctive relief. *Jones v. United States Department of Housing and Urban Development,* 390 F.Supp. 579, 592 (E.D.La.1974); *Greene County Planning Board v. Federal Power Comm'n,* 455 F.2d 412, 425 (2d Cir. 1972) *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90; *Environmental Defense Fund v. Froehlke,* 348 F.Supp. 338 (W.D. Mo.1972). Moreover, it is clear that "[t]he burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Authority v. Callaway, supra,* at 573.

■ At the outset, the court entertains grave doubts that plaintiffs are substantially likely to prevail on the merits in the instant action, since the decision to demolish Rockdale appears to be reasonable and based upon consideration of many alternatives. Furthermore, the demolition decision appears to be fully consistent with current philosophies and statutory provisions mandating that federal housing policies should seek dispersion and integration of the lower-income segment of the population into the community as a whole. Undoubtedly, any injury that the decision to demolish will precipitate will be irreparable; however, for reasons stated earlier in this order, this court doubts that plaintiffs herein will suffer from such injury. In weighing the potential harm to plaintiffs in the absence of an injunction with that which will be suffered by defendants should the court grant the injunction, the court is constrained to conclude that these factors are in balance or even favorable to plaintiffs. Similarly, the public interest factor appears to be in balance or in favor of plaintiffs. In such circumstances, where the other factors and relative hardships of the parties appear in balance, the critical issue becomes the likelihood of success on the merits, for it is inequitable to grant a preliminary injunction if the plaintiff has no ultimate chance of success on the merits. *Canal Authority of Florida v. Callaway, supra,* at 576; *Hawthorn Environmental Preservation Association, et al. v. Coleman, supra.* In light of this court's conclusion that plaintiffs have little likelihood of ultimately prevailing on the merits, and in the absence of strong factors weighing to the contrary, this court concludes that plaintiffs have not met their burden of showing that preliminary injunctive relief is warranted.

Accordingly, for the reasons hereinabove expressed, plaintiffs' motion for a preliminary injunction is hereby DENIED.