Jeannette SILVA et al., Plaintiffs,
Appellees,

v.

EAST PROVIDENCE HOUSING
AUTHORITY et al., Defendants,
Appellees,

Carla A. Hills, etc., et al., Defendants,
Appellants.

No. 77–1087.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1977.

Decided Nov. 22, 1977.

Barry L. Goldstein, Atty., Civil Division, Dept. of Justice, Washington, D.C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., Lincoln C. Almond, U.S. Atty., Providence, R.I., and William Kanter, Atty., Civil Division, Dept. of Justice, Washington, D.C., were on brief, for defendants, appellants.

Barry Kusinitz, Providence, R.I., with whom Alden C. Harrington and Joseph F. Dugan, Providence, R.I., were on brief, for plaintiffs, appellees.

Before COFFIN, Chief Judge, TUTTLE, Circuit Judge,* and CAMPBELL, Circuit Judge.

COFFIN, Chief Judge.

This appeal asks whether the Secretary of the Department of Housing and Urban Development (HUD) has the power to terminate a low rent public housing project contract with a local housing authority for lack of diligent prosecution. If the power exists, a second question is whether, in this case, HUD acted so unreasonably as to render the termination invalid.

Plaintiffs-appellees are prospective tenants of the low rent housing which would be built by the contract which HUD terminated. HUD had entered into a Cooperation Agreement with the city of East Providence, 42 U.S.C. § 1415(7)(b); received the city's approval of a preliminary loan to its local public housing agency, the East Providence Housing Authority (EPHA), 42 U.S.C. § 1415(7)(a); and had executed an Annual Contributions Contract (ACC) with EPHA, providing for the financing and construction of 100 units of low rent housing.

After a history (which we later summarize) of local opposition and delay, HUD terminated the ACC for lack of diligent prosecution. Plaintiffs brought suit to challenge the validity of the action and to enjoin any recapture of funds. The district

court, on cross-motions for summary judgment, held that HUD's action in terminating the ACC was beyond the Secretary's statutory authority or, if not *ultra vires*, was an abuse of discretion.

The first question before us is whether the Secretary has the power to include in an ACC a condition that failure to prosecute a housing project diligently shall be cause for termination. It is a question of law. Even so, our charter is limited to some extent by the precept that we accord deference to an agency's interpretation of its enabling legislation. *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).[1] We take the restriction to mean at least that if the agency's interpretation can be seen, without straining, to be consistent with the statutes, we should accept it.

Here the question is whether the general grant of authority to the Secretary to "include in any contract . . . such other covenants, conditions, or provisions as he may deem necessary", 42 U.S.C. § 3535(i)(6), is narrowed by other statutes. The first is a section entitled "Preservation of low rents", § 1414, providing that an ACC may be terminated if a condition insuring the low rent character of a housing project is substantially breached, § 1415(3), and that conditions and covenants to insure such character may be inserted in the contract.[2] § 1415(4). The second is a provision subti-

---

* Of the Fifth Circuit, sitting by designation.

1. We note also that the HUD area program manager testified that HUD had terminated some twenty projects in the Boston area in the past three or four years. To the extent that this evidences "contemporaneous construction" by the department, it is entitled to weight. *F.T.C. v. Mandel Brothers*, 359 U.S. 385, 391, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *Federal Housing Adm'n v. Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

2. Section 1415(3) and (4) read as follows:
"Annual contributions
(3) When a contract for annual contributions is made pursuant to section 1410 of this

title, the Authority shall retain the right, in the event of a substantial breach of the condition (which shall be embodied in such contract) providing for the maintenance of the low-rent character of the housing project involved, to reduce or terminate the annual contributions payable under such contract.
. . .
Contractual aids
(4) The Authority may also insert in any contract for . . . annual contributions, . . . such other covenants, conditions, or provisions at [as] it may deem necessary in order to insure the low-rent character of the housing project involved: . . . ."

tled "Limitation on aggregate contractual contributions" which allows a reallocation of funds from a project which has not gone into construction within five years from the date of reservation to a project in any state without regard to any preexisting limitation on units which could be placed in such state. 42 U.S.C. § 1410(e).[3]

The district court followed an "expressio unius, exclusio alterius" analysis, reasoning that the very limited statutory provisions for termination could not be enlarged by contract. If this is the result commanded by the statutes, we think it an unusual shackle on a financing agency. Were projects under contract to be termination proof for a period of five years, the Secretary's options would be restricted to taking over the local housing project, bargaining with the local agency for a reduced number of units to be constructed, temporarily suspending the project, or bringing suit to force compliance.

The first course, federal operation, is a necessary sanction but sacrifices, to the extent it is resorted to, the principle of maximizing local responsibility set out in 42 U.S.C. § 1401. To the extent that a federal takeover involves additional HUD personnel and resources, it diminishes HUD's capacity to serve other projects and fulfill the purposes of the Act. The second approach, amending the contract downward to fewer units, is useful in salvaging part of a project but obviously reduces the scope and effectiveness of the program. The third approach, suspension, is a temporary expedient, having a warning effect, holding up funding until deficiencies are corrected, but relying for its efficacy on the final sanction or action proposed if deficiencies are not

corrected. The final approach of bringing suit, valuable if selectively followed, would, if used on a wholesale basis, result in the freezing in lengthy litigation of large amounts of monies which could be fruitfully employed on other projects. All four approaches have their advantages and disadvantages.

So it would seem does the weapon of termination. While it amounts to temporary surrender of low rent housing goals in a given community, it does free funds for use elsewhere. More importantly, perhaps, the availability of termination would seem to have some value as a deterrent. So long as objectors to low rent housing know that the only results of their opposition will be a federal takeover, an agreement on fewer units, or a lawsuit which they may lose, they are in the enviable position of having their objections prevail but having the housing too. The option of termination, wisely used, is a way of letting chickens come home to roost, putting the onus for abandoning low rent housing on the responsible municipal officials. As the Third Circuit said recently in *Resident Advisory Board v. Rizzo*, 564 F.2d 126, 144 (3d Cir. 1977), "Normally, we would suspect that breaching an agreement with HUD, with the attendant risk of termination of all HUD aid, would be an unacceptable price for a City administration to pay for the cancellation of a housing project."

The court also relied on the common sense argument that since the federal government can force the municipality to adhere to the contract, *Cuyahoga Metropolitan Housing Authority v. Harmody*, 474 F.2d 1102 (6th Cir. 1973); *Davis v. City of Toledo, Ohio*, 54 F.R.D. 386 (N.D.Ohio,

---

**3.** Section 1410(e) reads as follows:

"(e) The Authority is authorized to enter into contracts for annual contributions aggregating not more than $554,250,000 per annum, which limit shall be increased by $100,-000,000 on August 1, 1968, and by further amounts of $150,000,000 on July 1 in each of the years 1969 and 1970, but any such contracts for additional units for any one State shall not, after June 30, 1961, be entered into for more than 15 per centum of the aggregate amount not already guaranteed under con-

tracts for annual contributions on such date: *Provided*, That subject to any contractual obligation outstanding on August 10, 1965, any units not under construction within five years from the date they were reserved to a public housing agency may be reserved, allocated, or placed under contract for annual contributions in any State without limitation as to the aggregate amount of units which may be placed under contract for annual contributions in any one State: . . . ."

W.D., 1970); *Village of Dupo v. St. Clair County Housing Authority*, 253 F.Supp. 987 (E.D.Ill.1966), to allow the federal government to terminate the ACC in the face of local opposition would permit municipalities to do indirectly what they could not do directly. The critical element left out of this syllogism is that the federal agency has the final decision. If it sees the national interest as requiring completion by the community, it can insist on completion. If it feels that the national interest is better served by using the funds elsewhere, it may terminate.

█ We therefore do not see that limiting the Secretary's power to terminate is commanded by either general policies of administration or by the broad purposes of the nation's low income housing policy. Coming to the specific termination statutes on which the district court relied, we do not view them as unambiguously restricting the general powers provision of 42 U.S.C. § 3531(i)(6). We start with the observation that a contract provision specifying failure to prosecute diligently as a substantial breach warranting termination is not uncommon.[4] We next observe that the statutory declaration of a strong national low income housing policy, contained in 42

U.S.C. § 1401,[5] does not by itself bar a federal agency from access to the sanction of withdrawing its support. Most agencies and departments carry out programs and projects in furtherance of important national policies. At least absent some additional specific affirmative action requirement, as in the area of racial discrimination, e. g., 42 U.S.C. § 3608(d)(5); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Shannon v. United States Dept. of Housing & Urban Dev.*, 436 F.2d 809 (3d Cir. 1970), we would assume that normally such agencies and departments would not be foreclosed from terminating contracts under which little or no progress is being made.

More particularly, we view both 42 U.S.C. §§ 1415(3) and (4) and 1410(e) as special purpose provisions. Section 1415 seems to us readable, as the Secretary has read it, as evidencing the particular concern of the Congress that, whatever other conditions be incorporated in an ACC, there must be an extra provision geared to the ultimate purpose of the Act. But this, we think, does not mean that ordinary, prudential provisions cannot be utilized.[6] Similarly, we see 42 U.S.C. § 1410(e) as addressing the specific problem of ceilings on units for the states. Gross delays, those over five years, should release the funds for any state, if

---

4. In volume 4A of "Government Contracts" by McBride, Wachtel, and Touchey, the following comments are suggestive:

—"Any right which the Government may have to terminate a contract for default must be grounded upon some breach of his obligation by the contractor." § 31.110, p. 31–107.

—"The default provision of the standard Government construction contract . . . allows the Government to terminate the contractor's right to proceed if he fails to prosecute the work with such diligence as will insure its completion within the time specified or any extension thereof." § 31.120, p. 31–110.

—"A consideration of these cases leads to the conclusion that where the contractor is inexcusably in default the Government may elect to terminate or it may seek continued performance." § 31.160[4], p. 31–181.

5. Section 1401 reads as follows:

"It is [hereby] declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit . . . to assist the several States and their political subdivisions . .

to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income . . . [I]t shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons. . . ."

6. For example, Part Two, Sec. 509 of the ACC allows termination, unless a project has been permanently financed, for fraud or misrepresentation as an inducement. The district court's restrictive holding as to HUD's power would prevent termination for even the most serious fraud inducing the ACC.

The same section also allows termination for a "Substantial Breach", defined in Sec. 507, as including in addition to the failure "to prosecute diligently" requirement, various kinds of financial mismanagement, and continued default in payments of interest and principal.

We cannot imagine that the management of such a complex enterprise as a housing project would be viable without this kind of enforcement apparatus.

there is a need, regardless of the ceiling previously set. We have, in this instance, some support from the legislative history.[7] Termination for delays for a shorter time would require the funds to be reallocated to the same state. This seems to us an entirely supportable reading of the statute.

█ We therefore conclude that the Secretary's determination that she does have the power to include in contracts for low rent housing a termination clause for failure of a local agency to prosecute a project diligently is a reasonable interpretation of the statutes. This brings us to the second question, whether the district court correctly held that the Secretary's decision to terminate was "a clear error of judgment in excess of statutory authority."

The district court in approaching this issue adopted a standard of rigorous scrutiny, borrowed from *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 302, 501 F.2d 848, 862 (1974). Under this test of "reasonableness", as opposed to "rational basis", the court faulted HUD for its failure to articulate reasons for not following alternative courses such as initiating court action, taking over control of EPHA, suspending the project, or reducing the number of units, and for not demonstrating, in accordance with HUD's own guidelines, that termination was a "last resort". The court concluded that instead of performing its affirmative duty to advance the Act's low income housing objectives, HUD attempted no other approach and decided to terminate for reasons of administrative convenience, thus committing a clear error of judgment.

*Commonwealth of Pennsylvania* dealt with HUD's action in effecting a nationwide suspension of several Congressionally authorized housing programs for non-fulfillment of statutory objectives. HUD was not deciding whether to fund or terminate a specific project but had made the awesome decision not to carry out some programs at all. Its discretion being properly deemed very narrow, rigorous scrutiny was likewise appropriate. This was a very special situation. We think that the standard generally applicable to administrative action as set forth in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), applies here:

"Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' . . . To make this finding the Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error or judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

The record of HUD's actions in this case is a mixed one, showing neither a posture of steady and positive leadership nor one of supine indifference to the fate of low rent housing in East Providence. From the filing of EPHA's application in September of 1969 through February of 1971, progress seems to have been without exceptional problems. Sites for thirty housing units had been obtained and bids authorized. The original project of 100 units was split, the remaining seventy units being the subject of a separate development program. In December of 1970 citizens protests arose against further low rent housing plans. A four month hiatus, as to which we know nothing, ensued until April 5, 1971, when

---

7. The Senate Report states:

"Agency testimony reveals that there have been long delays in placing some low-rent housing projects under construction and, in some cases, eventual abandonment of the project. On the other hand, in other areas, the statutory limit of funds for any one State may be reached even though there is an urgent need for more low-rent housing and the local housing authorities could proceed without delay in providing such additional low-rent housing. The bill would amend existing law to permit the agency to transfer reservations which have not been placed under construction within five years from the date of reservation to another housing authority in any state, whether or not the aggregate State limitation has been reached." S.Rep.No.378, 89th Cong., 1st Sess. 40 (1965).

HUD was advised that a city council meeting that night might result in action to stop the program. HUD's reaction was low on the Richter scale of tremors; it sent a telegram to the Mayor advising him to "give serious thought to ramifications". The council voted to ask EPHA to proceed no farther with the seventy units.

Despite advice from its own attorney that complying with the council's request would breach EPHA's contract with HUD, EPHA voted to go no farther. Another hiatus[8] appears in the record, this one being nine months, until January 25, 1972 when a meeting was held with HUD, the city officials, and EPHA, all agreeing that a proposal for seventy units must be submitted. HUD followed this up promptly by advising EPHA that funds could and would be used elsewhere if a definite proposal were not forthcoming. On February 15, 1972 EPHA made a proposal. Ten days later HUD inquired what the views of the city council were. On March 13, 1972 EPHA, by a 2 to 1 vote, with 2 absentees, rescinded its earlier resolution and voted to proceed. HUD offered its assistance and issued a time schedule. EPHA submitted its development program at the end of May and began its search for sites.

Six and one half months went by and on December 15, 1972 HUD gave tentative approval for thirty potential sites. A city election had been held and on February 26, 1973 the new city council voted not to request (as previously) but to direct EPHA to cease its work on the seventy duplex units and to turn its energies to repairing established homes or supplying new single family homes. In April EPHA asked HUD for advice. In early June EPHA supplied HUD with news clippings indicating that the council would no longer oppose the project if HUD decided to go ahead. On June 12, 1973, two months after being asked, HUD sent EPHA its legal opinion that EPHA was not bound by the council's resolution and that the city could not withdraw from its agreement. At the same time a lengthy internal HUD memorandum detailing the tortuous history of the project was prepared for HUD's program manager.

From this time on the record reveals HUD setting deadlines for actions to be accomplished, receiving either no reply for lengthy periods or non-responsive replies. EPHA was making no progress in acquiring sites and at an October 18, 1973 meeting informed HUD that it would not use the power of eminent domain. Although HUD had on several prior occasions told EPHA that its ACC might be cancelled if action were not forthcoming, HUD now initiated its termination process. HUD's area program director manager had updated the history of the project since June and recommended no further extensions in view of the unlikelihood of obtaining sites, particularly since EPHA would not resort to eminent domain. HUD's area director concurred and notified EPHA on November 1, 1973 that the termination of the ACC was being initiated.[9] HUD's internal processing of the termination action continued, despite appeals to reconsider and to convert the project to elderly housing, with cancellation taking place on July 2, 1974, because of the substantial breach of the ACC occasioned

8. HUD's regional program manager in charge of the project could recall nothing to explain this hiatus.

9. In January, 1973, a series of HUD directives froze further commitment of funds under subsidized housing programs. *See Commonwealth of Pennsylvania v. Lynn, supra,* 163 U.S.App. D.C. at 290–291, 501 F.2d at 850–51. This meant that any funds made available by terminating the East Providence project could have been used only for projects where there had been a firm commitment of funds or contract authority prior to January 5, 1973. Presently, we are informed by the parties, any such funds may be used for similar low income housing programs in other localities. Appellees argue that the process of gaining approval for a low income housing project today is more cumbersome than formerly and that the present policy of selecting tenants reflecting the income balance of the area inevitably leads to the exclusion of some of the poor who would otherwise be accommodated. Even if the unavailability for other low income housing funds recaptured from a terminated project were a proper factor for consideration, it is not here the case that such funds will not be available for similar projects.

by the failure of EPHA to prosecute the project expeditiously.

This record admittedly does not show continuous HUD activity in the early years of this five year ordeal. But the first year and a half seemed to proceed satisfactorily. When community opposition surfaced in late 1970, a full year passed with no apparent effective leadership on HUD's part. In 1972 it seemed that progress was being made, but by early 1973 the battle lines were again drawn. Beginning with its legal opinion in June, HUD took a firm position which it kept till the end: proceed or terminate. In short, HUD's approach, after apparent passivity in the earlier period, was a combination of patience, technical and legal assistance when requested, some mediation, and resort during the last half year to threats of termination when deadlines were passed.

*Overton Park* limits a court, in reviewing an agency's action for arbitrariness, to inquiring "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 824. To take the second inquiry first, we cannot find that such facts as appear from the record point to a "clear error of judgment". Obviously the decision was not a hasty one, but was arrived at incrementally over time. There is no indication of any HUD complicity in sabotaging the project. The long history of EPHA's delay, capitulation to city council resolutions, lack of success in obtaining sites, and intransigent refusal to use the tool of eminent domain were adequate bases for HUD's eventual termination. HUD clearly announced the basis for its decision.

We have more difficulty in assuring ourselves that HUD's decision was based on a consideration of "the relevant factors". This requirement has been specifically applied in *Cole v. Lynn*, 389 F.Supp. 99 (D.D.C.1975), where the court prohibited HUD from proceeding with the demolition of a housing project until it had considered several other alternatives. By way of contrast, the court in *Sadler v. 218 Housing Corp.*, 417 F.Supp. 348 (N.D.Ga.1976), was able to distinguish *Cole* since in *Sadler* a full record had been developed, showing that alternative courses had been considered and rejected before HUD resorted to foreclosure.

In *Cole v. Lynn* the court was impressed by the strong policy objectives underlying low income public housing programs and observed that HUD could not fulfill its responsibilities by acting like an ordinary commercial lending agency. In the instant case, in addition to the strength of the policy expressed in 42 U.S.C. § 1401 and other sections, HUD's own Instructions Handbook stated: "Termination of an [ACC] should only be used as a last resort when all other efforts have failed to achieve correction of the contractual deficiencies and where termination is in the best interest of the Government."

Notwithstanding *Overton Park*, the statutory goal of increasing the supply of low cost housing, and HUD's own instructions to its officials charged with the supervision of projects, the regional program manager testified that, so far as he knew, no thought had been given to any course of action on HUD's part except termination. In the absence of any showing of express consideration of alternatives, we are forced to scrutinize for such light as might be shed on the feasibility of other courses HUD might have pursued.

The district court cited the possibility of reducing the number of units in the project as an option short of termination. But the record shows that after 30 of the original 100 sites were developed, no further sites were acquired for a long period of time and EPHA refused to use its instrument of eminent domain. Since there is nothing to indicate that this attitude would have changed if somewhat fewer units were to be specified for the project, we are satisfied that this alternative was not realistic under the circumstances of this case.

The same cannot be confidently said for a second option, suspension. Suspension is a temporary expedient and acts as a warning of things to come if deficiencies are not

corrected. In this case there was such a lack of ongoing activity that there might have been little for HUD to suspend. Yet suspension would have cost little in terms of the already substantial delay in completing the project, and it is not clear from the record that the local officials would have ignored this kind of formal warning of termination if specific shortcomings delineated in a suspension notice were not remedied.[10] Were this the only alternative not considered, we would perhaps not find fault with the record of HUD's deliberations. But there were two other unexplored courses.

There was another alternative, federal takeover, which was also available but untried. It may have sacrificed the policy of cooperation with local authorities, see 42 U.S.C. § 1401, by requiring HUD to assume EPHA's responsibilities for administering the existing 30 unit project and breathing life into the 70 unit project. It could be argued, moreover, that, rather than cure the deficiencies of a party to the contract, as the HUD guidelines recommend, takeover would amount to action in spite of the ACC. But such an option would have preserved the primary statutory policy of providing decent housing for low income families, see 42 U.S.C. § 1401. Although possibly unwise under the circumstances, it was a realistic possibility HUD appears not to have considered.

Finally, there was the option of consideration of a lawsuit or the threat of one. According to the program manager, legal action was never contemplated by him prior to framing his recommendation of termination. As pointed out at the program manager's deposition, the responsibility for recommending suit is that of HUD's General Counsel. Here, so far as the record indicates, there was no communication between HUD officials in charge of the project and the General Counsel. There may of course have been in fact specific discussions or general procedures or policies concerning

the appropriateness of threatening or initiating litigation. And the commitment of the government's litigation resources must be left to the discretion of the responsible authorities. But we cannot, on this record, dismiss as patently unrealistic any effort by HUD to procure compliance through insisting on its legal rights.

We come down to the question whether, in the light of the strong policy directive of the statutes, the demonstrated need for public housing in the community, the existence of a binding Annual Contributions Contract between HUD and EPHA, and HUD's "last resort" guideline in its Handbook, HUD may terminate a public housing project without considering the appropriateness of three remedies less severe than termination. If it may, then it seems to us that the utility of a contract so easily discarded may be questioned, as well as whether a decision so made can truthfully be said to be "in the interest of the government".

 We therefore are in somewhat of a dilemma. We find the record of decision making defective for failure of HUD to consider all relevant factors, but we realize that a decision by HUD not to exercise any of the three options could only in the rarest of circumstances be held to be arbitrary or capricious. We therefore take the same course taken by the court in *Kent Farm Co. v. Hills*, 417 F.Supp. 297 (D.D.C.1976)—the same court which decided *Cole v. Lynn, supra*—and the same course we have taken in *First Bank & Trust Co. v. Smith*, 509 F.2d 663 (1 Cir. 1975), and *Maine v. Kreps*, 563 F.2d 1043 (1 Cir. 1977). We remand to the district court to allow HUD to shed further light on any specific consideration it may have given to the feasibility of suspension, takeover, or suit to enforce its contract with EPHA or any general procedures or policies then governing its decisions to pursue those courses. If specific consideration was given to these alternatives, or if applicable general procedures indicate they were

---

**10.** Although it is admittedly with the benefit of hindsight, we note that after suit was commenced, the Mayor and City Council of East

Providence withdrew their formal opposition to the project.

inappropriate in this case, the district court should vacate the injunction, in the absence of sheer arbitrariness. If, however, it appears that no consideration was given by any responsible official in HUD to these possibilities we have mentioned, and that no procedures otherwise indicated their inappropriateness, then the district court should send the matter back to HUD so that it may review its determination to terminate in the light of presently prevailing circumstances.

*The case is remanded to the district court for further proceedings in accordance with this opinion.*